### Richmond

LINWOOD EARL BRILEY

v.

COMMONWEALTH OF VIRGINIA

November 26, 1980.

Record No. 800690.

Present: All the Justices.

*Frank N. Cowan* (*Deborah S. O'Toole; Cowan, Owen & Nance,* on brief), for appellant.

*James E. Kulp, Deputy Attorney General* (*Marshall Coleman, Attorney General,* on brief), for appellee.

CARRICO, J., delivered the opinion of the Court.

In a two-stage jury trial conducted in accordance with Code §§ 19.2-264.3 and -264.4, the defendant, Linwood Earl Briley, was convicted of capital murder for a willful, deliberate, and premeditated killing occurring in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(d), and his punishment was fixed at death.[1] After receipt of a post-sentence report of a probation officer, Code § 19.2-264.5, the trial court imposed upon the defendant the sentence fixed by the jury. Pursuant to Code § 17-110.1(A) and -110.1(F), the defendant is here for automatic review of his death sentence, consolidated with his appeal from his conviction.

The victim in the case, John Harvey Gallaher, was a disc jockey for a Richmond radio station and a member of a small "musical combo." On the evening of September 14, 1979, Gallaher was playing

---

[1] The defendant was convicted also of using a firearm in the commission of murder. This conviction, however, is not involved in, or pertinent to, this appeal.

with the "combo" at the Log Cabin, a southside Richmond restaurant. During an intermission, Gallaher left the restaurant by a rear door. He never returned. Two days later, his bullet-torn body was found, half-submerged, at the foot of a bank on Mayo Island in the James River.

On October 22, 1979, Duncan Meekins was arrested and charged in connection with the robbery and murder of Gallaher. Subsequently, Meekins implicated the defendant in the offenses.

Meekins was the Commonwealth's principal witness at the defendant's trial. In his testimony, Meekins stated that, on the evening in question, he was with the defendant and the latter's two brothers, Anthony and James, when the foursome decided to look for "somebody to mug." The group had a sawed-off shotgun and a high-caliber rifle in their car as they drove up and down Jefferson-Davis Highway in southside Richmond looking for a likely victim. Unsuccessful in their quest, they parked near the Log Cabin "to see if [a possible victim] was going to come out." Exiting their car, they hid behind some bushes at the rear of the Log Cabin, with the defendant carrying the rifle and Meekins the shotgun.

According to Meekins' further testimony, Gallaher came out the rear door of the Log Cabin and walked over to the bushes where the waiting gunmen were hiding. The defendant accosted Gallaher, ordered him to lie face-down on the ground, and removed his wallet and keys. At the defendant's direction, Meekins went to look for Gallaher's automobile. When Meekins returned with the car, a Lincoln Continental, he and the defendant forced Gallaher to lie on the rear floorboard. With Meekins in the back seat guarding Gallaher, the defendant drove the car away. Anthony and James drove off in the automobile in which they had arrived at the Log Cabin; sometime later, Anthony and James parked their car and joined the defendant and Meekins in Gallaher's automobile.

Continuing with his testimony, Meekins stated that the defendant drove to Mayo Island in the James River and parked on the grounds of a paper company located there. The defendant and Meekins forced Gallaher from the car. When Gallaher "started struggling like to stand up," the defendant "came up with the rifle and shot him."

Concluding his testimony, Meekins said that 15 to 20 minutes elapsed from the time Gallaher was seized at the Log Cabin until he was shot on Mayo Island. After the shooting, the assailants left the murder scene and drove around the city in Gallaher's car. When

the "tank . . . almost . . . was on empty," the culprits parked the car and stripped it of parts.

Testifying in his own behalf as his only witness, the defendant denied all complicity in the robbery and murder of Gallaher. The defendant stated that, on the evening in question, he gave Meekins a ride to the home of Meekins' uncle in southside Richmond. After Meekins left the vehicle, the defendant proceeded toward a fried chicken restaurant to see a girl who worked there; en route, his car broke down, and he tried unsuccessfully to restart it. Sometime later, Meekins drove up in a Lincoln automobile and gave the defendant a ride home. The defendant admitted that he and Meekins stripped the Lincoln of parts.

Other testimony below showed that the defendant's fingerprints were found in Gallaher's car. When arrested, the defendant was wearing Gallaher's ring; Gallaher's watch was found in the defendant's home. The defendant told the arresting officer that he bought the ring and watch from a person known as "A.C." In his testimony, however, the defendant stated he purchased the items from Meekins.

In a pretrial motion, the defendant sought dismissal of his capital murder indictment on the ground that Virginia's death penalty statutes are unconstitutional. The trial court denied the motion. On appeal, the defendant states that he is familiar with the constitutional arguments advanced against the death penalty statutes in earlier cases before this court,[2] and he recognizes that the rulings in those cases are adverse to his position. The defendant says, therefore, that, while he wishes to preserve the points, he need not repeat the arguments. Further, the defendant raises purportedly novel arguments against the validity of the death penalty statutes. These arguments, however, are mere variations of the themes previously argued and ruled meritless. We need not repeat the rulings; we reaffirm them and, accordingly, reject all the defendant's arguments concerning the validity of the death penalty statutes.

In another pretrial motion, the defendant sought a change of venue based upon a claim of prejudicial publicity. The trial court

---

[2] The defendant cites: *Stamper v. Commonwealth,* 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied,* 445 U.S. 972 (1980); *Coppola v. Commonwealth,* 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied,* 444 U.S. 1103 (1980); *Clark v. Commonwealth,* 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied,* 444 U.S. 1049 (1980); *Mason v. Commonwealth,* 219 Va. 1091, 254 S.E.2d 116, *cert. denied,* 444 U.S. 919 (1979); *Waye v. Commonwealth,* 219 Va. 683, 251 S.E.2d 202, *cert. denied,* 442 U.S. 924 (1979); and *Smith v. Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967 (1979).

denied the motion. On the morning of trial, the defendant renewed the motion; the court again denied the request.

In support of his change-of-venue motion, the defendant submitted affidavits from members of the community, scripts of broadcasts by local television stations, and a notebook containing approximately 70 articles from local newspapers. These materials showed that, in the months preceding the defendant's trial for the present offenses, he and his brothers had been tried in the Richmond area on numerous charges of rape, robbery, and murder, all of which had been given extensive media coverage. In the opinion of the affiants in the several affidavits, the defendant could not "receive a fair trial by an unbiased and impartial jury in the City of Richmond."

Although acknowledging that the question whether to change venue generally is left to the sound discretion of the trial court, the defendant contends that the "unusual circumstances of this case and the resulting extensive media coverage" concerning his present and earlier crimes required the granting of his motion to change venue. Citing a number of our prior decisions involving change-of-venue questions,[3] the defendant argues that, in resolving the issue in this case, we should consider (1) the time elapsed between the commission of the crimes charged and trial, (2) the community interest in the case, and (3) the difficulty encountered in selecting a fair and impartial jury.

The defendant says that the publicity concerning his current and earlier crimes continued "right up to the time" of trial of the present charges. He states further that community interest in the case was aroused by the publicity to the extent that his name became "almost synonymous with 'brutal killings.' " Finally, he asserts that the selection of a jury in his case proved difficult, the process consuming over ten hours and requiring examination of 55 prospective jurors.

There are fatal weaknesses, however, in the defendant's position. He does not claim that any of the publicity about which he complains was either inaccurate or intemperate. *Greenfield* v. *Commonwealth*, 214 Va. 710, 717, 204 S.E.2d 414, 419 (1974). Neither has he demonstrated "such a widespread feeling of prejudice on the part of the citizenry as [would have been] reasonably certain to

---

[3] The defendant cites: *Newcomer* v. *Commonwealth*, 220 Va. 64, 255 S.E.2d 485 (1979); *Poindexter* v. *Commonwealth*, 218 Va. 314, 237 S.E.2d 139 (1977); *Lewis* v. *Commonwealth*, 218 Va. 31, 235 S.E.2d 320 (1977); *Foster* v. *Commonwealth*, 209 Va. 297, 163 S.E.2d 565 (1968); and *Rees* v. *Commonwealth*, 203 Va. 850, 127 S.E.2d 406 (1962), *cert. denied*, 372 U.S. 964 (1963).

prevent a fair and impartial trial." *Coppola* v. *Commonwealth, supra* note 2, 220 Va. at 248, 257 S.E.2d at 801. Nor has he directed us to specific portions of the record "which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected." *Dobbert* v. *Florida,* 432 U.S. 282, 303 (1977).

In this latter connection, the defendant cites the voir dire examination of two prospective jurors, Barbara Smith and William Slaughter. The defendant argues that these prospective jurors should have been excluded for cause since widespread media coverage had influenced them to the extent that they had formed opinions concerning his guilt and, therefore, they could not stand indifferent in the case.

The record shows clearly, however, that while these two prospective jurors had read accounts or listened to broadcasts concerning the criminal activities of the defendant, neither venireman had formed an opinion concerning the defendant's guilt. Furthermore, both prospective jurors stated unequivocally that they would determine the case solely upon the evidence presented in court. Their exposure to media coverage, therefore, did not disqualify them from service on the defendant's jury.[4] *Irvin* v. *Dowd,* 366 U.S. 717, 723 (1961).

The defendant's complaint concerning pretrial publicity is no more than a claim that the sheer volume of the media coverage of his and his brothers' many crimes required a change in the location of his trial. Such a claim, standing alone, does not suffice to require a change of venue. *Dobbert* v. *Florida, supra,* 432 U.S. at 303; *Smith* v. *Commonwealth, supra* note 2, 219 Va. at 462, 248 S.E.2d at 140.

■ The defendant's next contention involves an incident occurring during the guilt stage of his trial. When chief prosecution witness Duncan Meekins was under cross-examination, defense counsel began to question him concerning a plea agreement he had made with the Commonwealth. Meekins stated that, in return for his truthful testimony, the Commonwealth had promised he would "get no more time than anybody else in this case." Asked whether this was "the extent of the agreement," Meekins replied, "[f]or this case, yeah." At this point, the prosecutor asked the court to confer with counsel out of the hearing of the jury.

In the conference, it was revealed that the plea agreement encompassed not only the present case but also a number of other cases in which Meekins was charged along with the defendant and his

---

[4] Barbara Smith actually served on the defendant's jury. William Slaughter was excluded by the exercise of a peremptory challenge by the defense.

brothers. In one of these prosecutions, Meekins himself was subject to the death penalty. The plea agreement provided that, in return for Meekins' testimony against the Brileys in each case involving them, the Commonwealth would not seek the death penalty against Meekins and he would not receive any sentence greater than was imposed upon his accomplices in the various cases.

Defense counsel proposed to inquire fully into the plea agreement and the other crimes with which Meekins was charged. Defense counsel desired to show the "pressure brought to bear" upon Meekins and to demonstrate that he was testifying against the defendant in return for the Commonwealth's promise that "he [would] not get the chair."

The trial court ruled that, if defense counsel examined Meekins concerning the other crimes, the Commonwealth would be permitted to question the witness with respect to the defendant's participation in the same offenses. Defense counsel elected not to pursue the matter further.

The defendant argues that "there was no basis upon which the trial court [could] have made [its] ruling"; the defendant's involvement in the other crimes was irrelevant to Meekins' motivation for testifying on behalf of the Commonwealth. In imposing a condition upon further cross-examination, the defendant maintains, the trial court denied his constitutional right to confront his accusers and limited his ability to demonstrate a basis for bias or prejudice on Meekins' part.

The defendant relies upon our decisions in *Woody* v. *Commonwealth,* 214 Va. 296, 199 S.E.2d 529 (1973), and *Deavers* v. *Commonwealth,* 220 Va. 14, 255 S.E.2d 458 (1979), as support for his argument. Both cases, however, are inapposite. In *Woody,* we reversed the trial court's refusal to permit the accused to cross-examine accomplices concerning their participation in other crimes, not involving the accused. We said the cross-examination was proper to show the witnesses were testifying falsely in the hope of obtaining leniency in the other cases. In *Deavers,* we held that the trial court had erred in denying the accused permission to cross-examine an accomplice concerning whether the latter had been offered leniency in exchange for his testimony.

In both *Woody* and *Deavers,* the denial of the right of cross-examination was absolute with respect to the particular point involved. Here, there was no denial of any right. The defendant had shown the jury that Meekins was testifying pursuant to a plea agreement and had brought out what the agreement provided concerning

the present case. The trial court merely warned defense counsel of the consequences that would flow from inquiry into the other crimes with which Meekins was charged.

We do not believe the trial court erred in its ruling. The situation here is identical with that addressed in *United States* v. *Barrentine,* 591 F.2d 1069 (5th Cir.), *cert. denied,* 444 U.S. 990 (1979). There, in a gambling prosecution, the government's star witness, an accomplice of the appellants, was cross-examined concerning his prior arrests on other charges. On redirect examination, the prosecution was permitted to show by the witness that one of his prior arrests involved an incident where he had picked up marijuana at the request of one of the appellants. As in the present case, the trial judge in *Barrentine* had warned defense counsel that questioning the witness concerning other crimes would open the door to redirect testimony of the appellants' involvement in those crimes. The Fifth Circuit affirmed, stating:

> Cross-examination on a part of a transaction enables the opposing party to elicit evidence on redirect examination of the whole transaction at least to the extent that it relates to the same subject.

591 F.2d at 1081. We adopt the quoted language as applicable here and dispositive of the question under discussion.

This brings us to the defendant's major contention. Here, the defendant argues that the trial court erred in refusing a defense instruction which would have permitted the jury to find that the robbery of Gallaher terminated at the Log Cabin restaurant and, therefore, that the defendant was guilty only of the non-capital offense of first degree murder in the subsequent killing of Gallaher. As a corollary, the defendant argues that the court erred further in refusing to permit defense counsel to argue the first-degree-murder theory before the jury.

At this point, it is important to clarify what the trial court ruled and what it did not rule. Contrary to the indication in the defendant's brief, the court did not rule as a matter of law that the killing of Gallaher occurred in the commission of robbery. Out of the hearing of the jury, the court did rule that, if the jury believed the defendant robbed Gallaher at the Log Cabin, then, as a matter of law, the robbery continued until Gallaher's subsequent death on Mayo Island. The record does not reveal, however, that this ruling was ever com-

municated to the jury. Further, contrary to what the defendant suggests, the lower court did not prohibit counsel from arguing to the jury that the killing did not occur in the commission of robbery.

The record shows the trial court granted Instruction 6, which told the jury that the burden was upon the Commonwealth to prove, *inter alia,* the killing of Gallaher occurred during the commission of robbery and that, in the failure of this burden of proof, the jury should find the defendant not guilty of capital murder. The court also granted Instruction 10A, which defined the offense of robbery. And, in the discussion between court and counsel concerning instructions, the trial judge made clear defense counsel could argue to the jury that the Commonwealth had failed to prove "the elements of the crime" of capital murder, including the element "that the killing occurred during the comission of robbery." The court only prohibited defense counsel from arguing that the robbery, if it occurred, terminated with the conclusion of the events at the Log Cabin restaurant.

With this clarification, it is obvious that the trial court took the position that the jury should be permitted only two options, *viz.,* to find the defendant guilty of capital murder or to acquit him. Relying upon *Beck* v. *Alabama,* 447 U.S. 625 (1980), the defendant argues that the jury should have been given a third alternative, *viz.,* to convict him of the lesser included offense of first degree murder on the theory that the robbery of Gallaher had terminated well in advance of the murder.

In *Beck,* a capital case involving robbery and murder of the victim by the accused and an accomplice, the trial court refused the defense a first-degree-murder instruction. Noting that the accused had admitted participation in the robbery but had denied killing the victim or intending his death, the Supreme Court reversed, stating that the defense was entitled to the instruction.

*Beck,* however, is inapposite. Unlike the accused there, this defendant denies all complicity in both the robbery and the killing of the victim. Furthermore, in *Beck,* an Alabama statute forbade the granting of lesser-included-offense instructions in capital cases. Virginia has no similar statute or other rule of law requiring the same result. In this state, such instructions are proper, but only when supported by evidence. *Clark* v. *Commonwealth, supra* note 2, 220 Va. at 209, 257 S.E.2d at 789; *Painter* v. *Commonwealth,* 210 Va. 360, 367, 171 S.E.2d 166, 171 (1969). *Beck* did not affect this rule. Indeed, the holding in *Beck* was responsive to this question:

> "May a sentence of death constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and *when the evidence would have supported such a verdict?*" (Emphasis added.)

447 U.S. at 627. The question becomes, therefore, whether there was any basis in the present case for permitting the jury to consider a verdict of guilt of a lesser-included non-capital offense.

In this connection, both the defendant and the Attorney General cite our decision in *Haskell, et al.* v. *Commonwealth*, 218 Va. 1033, 243 S.E.2d 477 (1978). There, the three appellants and a fourth assailant named Gaynor attacked a sailor pursuant to a predesigned plan to rob him. When the robbers found no money on the victim, they tried to get into their car and drive away. The victim attempted to prevent their escape, and Gaynor shot and killed him. Convicted of attempted robbery and murder, the appellants contended on appeal that the evidence did not sustain their convictions under the felony-murder doctrine because the attempted robbery had been abandoned before the victim was shot. Rejecting this contention after an examination of numerous authorities, we said that, under the prevailing rule:

> [T]he felony-murder statute applies where the initial felony and the homicide were parts of one continuous transaction, and were closely related in point of time, place, and causal connection, as where the killing was done in flight from the scene of the crime to prevent detection or promote escape.

218 Va. at 1041, 243 S.E.2d at 482.

We stated further:

> The rule which we adopt, therefore, consistent with the weight of authority elsewhere, is that the felony-murder statute applies where the killing is so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise.

218 Va. at 1043-44, 243 S.E.2d at 483.

The defendant here relies upon the portion of the *Haskell* opinion wherein we observed that "[i]t was for the fact finder to determine . . .

whether the attempted robbery had been terminated within the purview of the [felony-murder] statute." 218 Va. at 1043, 243 S.E.2d at 483. But, in *Haskell*, the finding concerning the termination of the attempted robbery actually had been made by the trier-of-fact; we were not called upon to decide whether the determination properly might have been made as a matter of law. As the Attorney General points out, *Haskell* does not require that the trier-of-fact always determine whether an initial felony has terminated in advance of a homicide. Indeed, the *Haskell* opinion indicates clearly that, in an appropriate case, the issue properly may be decided as a matter of law. 218 Va. at 1044, 243 S.E.2d at 484.

The defendant maintains, however, that, in refusing to permit the jury in this case to determine whether the robbery of Gallaher terminated before the killing, the trial court improperly applied a liberal interpretation of the felony-murder doctrine. A capital murder case differs from the typical felony-murder situation, the defendant asserts, and the decisions of the United States Supreme Court require a more restrictive interpretation of applicable principles in death penalty cases.[5]

Even giving applicable principles strict interpretation, we believe the trial court did not err in refusing a first-degree-murder instruction and in ruling that, if a robbery occurred in this case, it did not terminate with the conclusion of the events at the Log Cabin restaurant. Uncontradicted evidence supported the trial court's holding concerning the continuation of the robbery; no evidence supported granting the instruction.

The distinctive elements of robbery are (1) the use of violence, or the threat thereof, against the victim, and (2) the theft of property from his person or in his presence. Theft of property is a trespass upon the rights of the owner therein for as long as he is deprived of the use thereof; he retains legal possession of the goods stolen even when they are in the actual possession of the thief. *Dunlavey* v. *Commonwealth*, 184 Va. 521, 525-26, 35 S.E.2d 763, 765 (1945). In a robbery prosecution, where the violence against the victim and the trespass to his property combine in a continuing, unbroken sequence of events, the robbery itself continues as well for the same period of time.

Here, obviously, the jury believed a robbery occurred. It is equally

[5] The defendant cites: *Godfrey* v. *Georgia*, 446 U.S. 420 (1980), *Jurek* v. *Texas*, 428 U.S. 262 (1976); *Proffitt* v. *Florida*, 428 U.S. 242 (1976); *Gregg* v. *Georgia*, 428 U.S. 153 (1976); and *Furman* v. *Georgia*, 408 U.S. 238 (1972).

obvious that Gallaher's automobile was a fruit of the robbery. Uncontradicted testimony submitted by the Commonwealth showed conclusively that the violence against Gallaher and the trespass to his automobile combined and continued unabated from the time of the initial taking of the car at the Log Cabin until Gallaher was killed on Mayo Island only 15 to 20 minutes later. Thus, borrowing and adapting the language of *Haskell,* we hold that the killing involved here was so closely related in time, place, and causal connection as to make the killing, as a matter of law, a part of the same criminal enterprise. *Cf. Doane* v. *Commonwealth,* 218 Va. 500, 237 S.E.2d 797 (1977) (where no causal relationship or nexus shown between antecedent felony and killing, accused not guilty of felony-murder).

■ One defense argument remains in this phase of the case. The defendant maintains that he cannot be convicted of capital murder for a robbery involving the theft of Gallaher's car because there was no evidence that the defendant or his accomplices "intended to take [the car] permanently." We reject this argument out of hand. We can conceive of no more conclusive evidence of the intent to deprive an owner of his car permanently than the testimony presented in this case that the car was stolen contemporaneously with the murder of its owner and later abandoned and stripped of parts.

■ The defendant's next contention concerns the trial court's refusal, in the penalty stage of the trial, to grant defense Instruction A2. This instruction would have told the jury:

> The Court instructs the jury that even though you may believe that the Commonwealth has proven, beyond a reasonable doubt, the elements necessary for you to recommend that Linwood E. Briley be put to death, you are not required by law to recommend the death penalty and you may fix Linwood Earl Briley's punishment at imprisonment for life.

The defendant argues this instruction was necessary to inform the jury clearly that it was not bound to recommend the death sentence in any event. In Instruction 1A, however, the trial court told the jury:

> You have convicted the defendant of an offense which may be punished by death. You must decide whether the defendant shall be sentenced to death or to life imprisonment. Before the

penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives:

> (1) That, after consideration of his past criminal record, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society;
> or
> (2) That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.
> If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt either of the two alternatives, then you may fix the punishment of the defendant at death or *if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at life imprisonment.*
> If the Commonwealth has failed to prove either alternative beyond a reasonable doubt, then you shall fix the punishment of the defendant at life imprisonment. (Emphasis added.)

In our opinion, this last-quoted instruction clearly and sufficiently informed the jury of its option to fix the defendant's punishment at life imprisonment, even though it also found the existence of the aggravating circumstances permitting a recommendation of the death penalty. Defense Instruction A2, therefore, was unnecessary. *Smith v. Commonwealth, supra* note 2, 219 Va. at 479-80, 248 S.E.2d at 149-50.

In his final assignment of error, the defendant contends that his sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factor and that the sentence is excessive or disproportionate to the penalty imposed in similar cases. Our examination of this record, however, convinces us that the defendant's sentence was not influenced by passion, prejudice, or other arbitrary factor. With respect to excessiveness or disproportionality, we have examined the records in two other death penalty cases

decided today[6] and in cases decided previously[7] in which death sentences were upheld. From this examination, we conclude that the defendant's sentence is not excessive or disproportionate.

Finding neither error in the judgment appealed from nor other reason to disturb the death sentence imposed in this case, we will affirm the defendant's conviction and sentence.

*Affirmed.*

---

[6] *James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 273 S.E.2d 57 (1980); *Turner* v. *Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980).

[7] The cases decided previously are listed at the end of the opinion in *James Dyral Briley* v. *Commonwealth, supra* note 6.