## Richmond

### HERBERT RUSSELL BASSETT

### V.

### COMMONWEALTH OF VIRGINIA

December 4, 1981.

Record No. 810301.

Present: All the Justices.

Robert P. Geary (Geary & Davenport, on brief), for appellant.
Linwood T. Wells, Jr., Assistant Attorney General (Marshall Coleman, Attorney General, on brief), for appellee.

THOMPSON, J., delivered the opinion of the Court.

On August 22, 1980, a jury convicted Herbert Russell Bassett of murder during the commission of a robbery while armed with a deadly weapon, Code § 18.2-31(d), and of the use of a firearm in

the commission of murder, Code § 18.2-53.1. The jury recommended a sentence of death. After considering a presentence report, on November 19, 1980, the trial court confirmed the jury's verdict and ordered that Bassett be executed. Code § 17-110.1(A) requires that we review the death sentence, and we have consolidated this review with Bassett's appeal of his capital murder conviction, Code § 17-110.1(F), and given them priority on our docket as mandated by Code § 17-110.2.

On the morning of November 24, 1979, a passerby discovered Albert Lee Burwell, Jr.'s naked body lying face down in a ditch along a road in eastern Henrico County. Burwell's father told the police that his sixteen-year-old son was the attendant at the Mascot Gas Station on Fairmont Avenue in Richmond. He last saw his son at the station on Friday, November 23, at approximately 5:00 p.m. According to the station's bookkeeper, Burwell's absence was noted between 10:30 p.m. and 11:00 p.m. on November 23. An inventory of Burwell's gas pump revealed a $212.00 shortage.

The forensic pathologist who performed the autopsy of Burwell found six gunshot wounds in the back, arm, and lip. Four of the six wounds revealed gun powder, indicating that the gun was fired within inches of Burwell. The pathologist stated that the two gunshot wounds of the back "had the capability for being fatal within a short interval" and "death from bleeding occurred within ten to thirty minutes."

In December, 1979, during a drug raid on Laverne Thornton's house, the Richmond police seized a .22 caliber revolver. A ballistics expert received the gun for examination and found that it had fired the shots which killed Burwell. Thornton told the police that her daughter, Belinda Atkinson, had given her the gun for protection. Atkinson stated that she had purchased the revolver for $75 from Betty Jean Winfield and that the purchase was made in the presence of Tyrone Jackson and Jeannette Green. The police arrested Jackson in December, 1979, and Winfield on January 8, 1980. A statement made by Winfield at the time of her arrest prompted Bassett's arrest the same day.

At trial, Winfield testified that when the Virginia Correctional Center for Women released her on November 20, 1979, she met Jackson, Bassett, and another man in Petersburg and that all four went to Richmond. Winfield stated that on Friday, November 23, 1979, Samuel Walker "Dap" Cook, Jr., and Jeannette Green

sought her aid in buying drugs and that Bassett allowed them to "shoot" the drugs in his house. Thereafter, Winfield, Green, and Sylvia Demetress Williams (now married to Bassett) drove to Ashland to pick up Bassett's paycheck, but failed to do so. Later, Winfield, Green, Cook, and Bassett left in Bassett's car to commit a robbery near Bassett's place of employment. They abandoned this venture because of the presence of the police near the intended site.

One of the group then suggested that they rob the attendant at the Mascot Station. Winfield testified that they arrived at the station between 11:00 p.m. and midnight, and that Bassett had the two women "create a diversion" to lure Burwell behind the station where Bassett robbed him. Bassett returned to the car with Burwell at gun point, forced him to enter the car and told him to start "taking his clothes off." With Burwell in the car, Bassett, Cook, and Winfield left the station. Bassett drove for about fifteen to twenty minutes, then stopped the car and ordered Burwell to lie in the ditch. Winfield testified that Bassett ignored Burwell's plea to live and stood over Burwell and shot him several times, leaving him to die. The parties hid the gun under a dumpster near Bassett's apartment. Winfield later met Jackson, and after telling him the details of the murder, they retrieved the gun and sold it to Belinda Atkinson.

Testimony given by Cook and Green corroborated Winfield's version of the events and happenings of November 23 and 24.

Bassett denied any knowledge of Burwell's death. He admitted that he allowed Winfield to stay in his apartment over Thanksgiving, 1979, but said that on Friday, November 23, Winfield, Cook, and Green left the house together and did not return that night. Bassett testified that he spent the entire evening with his wife, children, and parents. He said that he found Winfield asleep in the house the next morning. Bassett's wife, mother-in-law, and niece corroborated Bassett's alibi.

In the punishment phase of Bassett's trial, the Commonwealth established that Bassett's record revealed a 1963 conviction for unlawful wounding, with a 12-month sentence; a 1965 statutory burglary conviction, with a nine-month sentence; a 1966 conviction as an accessory after the fact in a breaking-and-entering, with a 12-month sentence; a 1966 escape conviction, with a six-month sentence; and a 1967 armed robbery conviction, with a 99-year sentence. On May 25, 1979, the Parole Board released Bas-

sett after he had served over 12 years of the armed-robbery sentence.

Bassett does not appeal his conviction of the use of a firearm in the commission of murder, but he does raise numerous questions concerning his capital murder conviction and sentence.

## I. *Cruel and Unusual Punishment.*

■ We have considered and find no merit in the argument Bassett made that the death penalty is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution or Article I, § 9 of the Virginia Constitution. *See Justus* v. *Commonwealth,* 222 Va. 667, 283 S.E.2d 905 (1981), and cases therein cited.

## II. *Future Dangerousness.*

■ Code § 19.2-264.4C permits the imposition of the death sentence for a capital offense after the Commonwealth proves beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society. To meet its burden of proof, the Commonwealth must rely on the "prior history of the defendant" or the circumstances surrounding the commission of the offense. Bassett contends that the statute provides inadequate guidelines or standards for the fact finder to follow in making this determination.

In *Smith* v. *Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), we noted that the continuing-threat provision of Code § 19.2-264.4C mirrored a Texas provision approved in *Jurek* v. *Texas,* 428 U.S. 262 (1976), and we found no constitutional vagueness in the statutory language:

> In our view, [the statute] is designed to focus the fact finder's attention on prior criminal conduct as the principal predicate for a prediction of future "dangerousness". If the defendant has been previously convicted of "criminal acts of violence", *i.e.,* serious crimes against the person committed by intentional acts of unprovoked violence, there is a reasonable "probability", *i.e.,* a likelihood substantially greater than a mere possibility, that he would commit similar crimes in the future. Such a probability fairly supports the conclu-

sion that society would be faced with a "continuing serious threat". [Footnote omitted.]

219 Va. at 478, 248 S.E.2d at 149. The provision has a common-sense meaning which a jury can understand and thus supplies a sufficient standard for a jury to predict future criminal conduct. *Jurek,* 428 U.S. at 275, 278-79.

The fact finder looking at Bassett's criminal record could determine that his past actions establish a clear pattern of criminal conduct. The record reveals a predisposition to commit another crime upon release from custody. For example, Bassett had served 12 years of a 99-year sentence for armed robbery when he was paroled. Within six months of his release, Bassett had planned and committed the crimes involved in the instant case. The statute is not vague, and the jury reasonably could find that Bassett poses a continuing serious threat to society.

### III. *Change of Venue.*

Bassett's first trial in June, 1980, ended in a mistrial when the jury could not agree on a verdict. The second trial commenced August 19, 1980, and Bassett claims that excessive publicity prevented a fair trial.

The presumption is that the accused can get a fair trial in the locality where the offense occurred. *Hampton* v. *Commonwealth,* 190 Va. 531, 58 S.E.2d 288 (1950). The accused has the burden of overcoming this presumption by clearly showing that a prevailing prejudice against him denies him a fair and impartial trial. *Newcomer* v. *Commonwealth,* 220 Va. 64, 255 S.E.2d 485 (1979); *Farrow* v. *Commonwealth,* 197 Va. 353, 355, 89 S.E.2d 312, 313 (1955). In *Farrow,* the defendant presented one affidavit, a local newspaper editorial, and two newspaper articles which were not prejudicial to the defendant or his victim. We held that the defendant failed to offer sufficient evidence to support a motion for a change of venue. In the instant case, the record reveals only a few nonprejudicial newspaper clippings. The *voir dire* examination indicated that only a very few of the potential jurors had knowledge of the offense and no juror stated he or she would be influenced by what had been seen or heard. The trial court properly overruled the motion for a change of venue.

## IV. *Prior Criminal Records of Prosecution Witnesses.*

The Commonwealth presented three key witnesses, Betty Winfield, Jeannette Green, and Samuel Walker "Dap" Cook, Jr. Each had been convicted of crimes. Bassett sought in a pretrial discovery motion before his first trial to obtain records of those convictions. He argued that the trial court's refusal prevented him from effectively impeaching the witnesses' testimony and contributed to his erroneous conviction. He seeks a special procedural rule permitting pretrial discovery of accomplices' criminal records.

There is no merit in this assignment of error because during the first trial the court ordered the Commonwealth's Attorney to provide the records. Bassett had them before his second trial in August.

## V. *Limitation on Voir Dire Questions.*

Bassett tendered 27 *voir dire* questions to the court. Eleven of these were propounded by the court to the members of the panel, and sixteen were not. Bassett complains that this refusal prevented him from determining whether the potential jurors stood indifferent in the case and denied him an impartial jury.

Bassett had no absolute right to have the court ask every question he propounded. The statute governing at that time, Code § 8.01-358[1], provided:

> The court and counsel for either party may examine under oath any person who is called as a juror therein and may ask such person or juror directly any relevant question to ascertain whether he is related to either party, or has any interest in the case, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein.

Further questions lie within the court's sound discretion. *Davis* v. *Sykes,* 202 Va. 952, 121 S.E.2d 513 (1961). We have carefully reviewed the questions refused and conclude that Bassett was not prejudiced thereby. He has not shown that the trial court abused its discretion in refusing to ask the remaining questions. In the absence of such a showing, we will not disturb the court's ruling.

---

[1] The General Assembly amended Code § 8.01-358 after Bassett's trial, substituting "shall have the right to examine" for "may examine" and "shall have the right to ask" for "may ask." Acts 1981, c. 280.

*Turner* v. *Commonwealth,* 221 Va. 513, 522, 273 S.E.2d 36, 41-42 (1980).

## VI. *Witness's Right to Confer with his Counsel During Cross-examination.*

■ Bassett complains that his Sixth Amendment right of confrontation was violated when the trial court permitted Samuel Cook, a Commonwealth's witness also indicted for Burwell's murder, to confer privately with his attorney during cross-examination. Cook's trial had been continued to a date subsequent to Bassett's and counsel for Bassett sought to impeach Cook's testimony by showing that Cook realized that implicating Bassett would benefit Cook during Cook's own trial. Cook stated that he did not know why his case had been continued, but only that his attorney had thought the continuance would be best. The court gave Cook permission to leave the witness stand to confer privately with his attorney. When Cook returned to the stand, his counsel explained to the court that he had advised Cook of his right to refuse to answer certain questions. Cook wished to testify and replied affirmatively when counsel for Bassett asked before the jury whether Cook's attorney had told him a continuance of his case was best. We see no possible injury to Bassett in this procedure and reject this assignment of error.

## VII. *Chain of Possession.*

■ Richmond Vice Detective Robinson, having seized the murder weapon in early December during a drug raid, gave it to Detective James Gaudet on December 10, 1979. Gaudet immediately delivered it to a forensic laboratory for examination. Detective Robinson died in April, 1980. Bassett contends that Robinson's death broke the chain of possession and that the court should not have admitted the gun in evidence. At trial the gun was identified by its serial number, and such an item possesses characteristics which are fairly unique, readily identifiable, and relatively impervious to change. In *Smith* v. *Commonwealth,* 219 Va. 554, 559, 248 S.E.2d 805, 808 (1978), we stated this rule: "All that is necessary to establish a chain of custody of exhibits is that the evidence afford reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first ob-

tained." The admission of the gun (Exhibit 6) in this case came within the rule.

## VIII. *Alleged Misnomer of Deceased.*

■ Bassett contends that the indictment was fatally defective because it described the deceased as Albert Lee Burwell instead of Albert Lee Burwell, Jr. Misnomer of a victim is not fatal when the victim's identity is made clear at trial. *Brown v. Commonwealth,* 138 Va. 807, 122 S.E. 421 (1924). Further, in *O'Bannon v. Saunders,* 65 Va. (24 Gratt.) 138 (1873), we held that "Jr." is not part of a person's name, but is mere *descriptio persona* and may be rejected as surplusage.

## IX. *Estoppel.*

■ Robinetta Wall, a Commonwealth's witness, testified that Tyrone Jackson had admitted to her that he had robbed and shot a man. Bassett contends that the Commonwealth is bound by her unimpeached testimony and estopped from convicting him because her statement shows "another person killed the victim." This assignment of error is without merit. The Commonwealth vouched for Wall's credibility, but was not bound by her testimony. *Hall v. Commonwealth,* 178 Va. 22, 26, 16 S.E.2d 304, 305 (1941). Further, Wall testified that she did not believe the statement made by Jackson and thought he was "jiving" her.

## X. *Sufficiency of the Evidence.*

■ Bassett contends that the evidence is insufficient to show that he committed murder in the perpetration of a robbery. He argues that the robbery occurred at a Richmond gas station, but the murder happened off Bickerstaff Road in Henrico County some 15 or 20 minutes later. He characterizes this interval separating the two events as "an enormous period of time" and argues that they were not "closely related" in "time, place and causal connection."

A similar argument was advanced in *Linwood Earl Briley v. Commonwealth,* 221 Va. 532, 273 S.E.2d 48 (1980). The defendant robbed the victim of his car outside a southside Richmond restaurant and murdered him 15 to 20 minutes later on Mayo Island in the James River. We said:

In a robbery prosecution, where the violence against the victim and the trespass to his property combine in a continuing, unbroken sequence of events, the robbery itself continues as well for the same period of time.

. . . [W]e hold that the killing involved here was so closely related in time, place and causal connection to make the killing, as a matter of law, a part of the same criminal enterprise.

221 Va. at 543-44, 273 S.E.2d at 55-56. We reject Bassett's contention on the same rationale.

### XI. *Objection to Improper Argument.*

 Bassett and his wife, Demetress, testified that they spent part of the night on November 23 looking for Mike Wade. Wade allegedly had damaged Demetress' mother's car and had promised to repair the vehicle. Bassett failed to call Mike Wade at trial as a corroborating witness. In the closing argument, the Commonwealth's Attorney stated ambiguously "Who's Mike? Did you see Mike? Did you? I didn't. I didn't see Mike." When the prosecution concluded his argument, the defense counsel objected, arguing that the prosecutor was testifying, thus improperly trying to discredit the alibi witness's testimony. The defense attorney, in his closing argument, admitted that the prosecutor must have meant that he did not see Mike Wade take the stand. However, defense counsel argued that the prosecutor could have called Wade in rebuttal, but did not, and that his argument had the effect of improperly impeaching Demetress. We reject this argument. The trial court determined that the prosecutor's remarks were not an attempt to discredit the witness's testimony, but rather were a proper comment upon the failure of defense counsel to call a potential corroborating alibi witness.

### XII. *Alibi Instruction.*

 Bassett complains of the alibi instruction that was given, arguing that it confused the jury as to the standard of proof required to establish an alibi.[2] We disagree. The instruction requires

---

[2] Instruction 2 reads:
The defendant relies upon the defense that he was not present at the time and place the alleged offense was committed. If, after consideration of all the evidence,

the jury to acquit the defendant if from all the evidence it has a reasonable doubt about his presence at the scene of the alleged crime. An instruction on the standard of proof in an alibi defense is unnecessary when the court instructs the jury, as the court did in this case, on the presumption of innocence and reasonable doubt. *Crabbe* v. *Commonwealth,* 221 Va. 419, 270 S.E.2d 727 (1980). A jury objectively reading the instruction complained of could not be misled, because nowhere does it require proof of alibi beyond a reasonable doubt or even by a preponderance of the evidence.

### XIII. *Reasonable Doubt Instruction.*

Bassett complains that the court gave no instruction on reasonable doubt at the trial's sentencing phase. The record shows that in making this contention Bassett is in error.[3] Bassett also complains that the trial court failed to redefine reasonable doubt during the penalty phase of the trial. The court defined reasonable doubt in the guilt phase as "a doubt based on [the jurors'] sound judgment after a full and impartial consideration of all the evidence in the case." The court committed no reversible error in refusing to redefine the term in the penalty phase.

### XIV. *Right of Self-representation.*

At the conclusion of all the evidence at the trial's sentencing phase, one of Bassett's counsel stated to the trial court that over their objection Bassett wished to address the jury. The court overruled the request, pointing out that, when the case started, the court had been advised that two attorneys would represent the defendant and that at no time prior thereto had Bassett requested permission to conduct his own defense. Bassett claims that this ruling violated his right of self-representation guaranteed in *Faretta* v. *California,* 422 U.S. 806 (1975). A defendant must assert the right to dismiss his counsel and conduct his own defense

---

you have a reasonable doubt that the defendant was present at the time and place the alleged offense was committed, you shall find him not guilty.

[3] Instruction A reads in pertinent part:

You have convicted the defendant of capital murder . . . . You must decide whether the defendant shall be sentenced to death or to life imprisonment. Before the penalty of death can be imposed as punishment in this case, the Commonwealth must prove *beyond a reasonable doubt* either one of the following two alternatives . . . . [Emphasis added.]

before meaningful trial proceedings have commenced. Once the trial begins, the exercise of that right lies within the trial court's sound discretion. *United States* v. *Lawrence,* 605 F.2d 1321 (4th Cir. 1979), *cert. denied,* 444 U.S. 1084 (1980), and *Coleman* v. *State,* 617 P.2d 243 (Okla. Crim. 1980). We find no abuse of the trial court's discretion in its denial of Bassett's motion.

## XV. *Evidence of Prior Convictions.*

During the penalty phase of the trial, the court permitted the Commonwealth to introduce Bassett's prior convictions, the sentences imposed, and portions of the official transcript from Bassett's 1967 armed robbery trial. Code § 19.2-264.4B provides "[e]vidence which may be admissible, subject to the rules of evidence governing admissibility, may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense."

Bassett admits that in *Stamper* v. *Commonwealth,* 220 Va. 260, 277, 257 S.E.2d 808, 820 (1979), we approved admitting evidence of prior convictions, but he urges excluding the sentences imposed. We reject his contention. The sentence reflects the gravity of the offense and the offender's propensity for violence.

Bassett further objects to admission of the trial transcript in evidence. The record indicates that the victim in Bassett's 1967 robbery trial had since died, and the transcript provided the best method of bringing the evidence before the jury. In *Stamper,* we approved the use of a prior victim's live testimony in the trial's penalty phase. 220 Va. at 275, 257 S.E.2d at 819. We find the use of the transcript here unobjectionable. *Shifflett* v. *Commonwealth,* 218 Va. 25, 235 S.E.2d 316 (1977); *Fisher* v. *Commonwealth,* 217 Va. 808, 232 S.E.2d 798 (1977).

## XVI. *Allocution.*

Bassett contends that his statutory right of allocution entitles him as a matter of law to address the jury prior to the determination of his sentence. He misconceives the function of allocution.[4] Allocution is the defendant's right to speak on his own behalf after the fact finder determines guilt but before the judge

---

[4] Code § 19.2-298. *Pronouncement of sentence.*— . . . . Before pronouncing the sentence, the court shall inquire of the accused if he desires to make a statement and if he desires to advance any reason why judgment should not be pronounced against him.

pronounces sentence. The defendant's closing argument is not allocution, but is his opportunity to present arguments in mitigation before the fact finder deliberates. Furthermore, the record and the final order show that the court permitted Bassett to address it at length.

 Bassett further claims that the revised death penalty statute is unconstitutional because it discriminates between capital defendants tried by a jury and those tried by the court. In capital trials before judges, Code § 19.2-298 permits the defendant to plead for mitigation before the judge determines punishment. In a jury trial, unlike a bench trial, Code § 19.2-264.5 defers allocution until the jury has deliberated and decided the sentence. Bassett's argument ignores Code § 19.2-264.4B.[5] This statute permits the defendant to present evidence in mitigation during the trial's sentencing stage. The defendant, through his attorney, addresses the fact finder in the closing arguments. Finally, the defendant has the right to allocution before the judge pronounces sentence in both bench and jury trials.

At the penalty phase, Bassett called witnesses and testified himself. In the guilt phase, he testified and was cross-examined. The record reveals that he received every opportunity to show all the relevant factors in mitigation.

XVII. *Failure of the Trial Court to Modify Death Penalty.*

 Code § 19.2-264.5 provides in capital cases that "[a]fter consideration of the [presentence] report, and *upon good cause*

---

[5] Code § 19.2-264.4B reads:

In cases of trial by jury, evidence may be presented as to any matter which the court deems relevant to sentence, except that reports under the provisions of § 19.2-299, or under any Rule of Court, shall not be admitted into evidence.

Evidence which may be admissible, subject to the rules of evidence governing admissibility, may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense. Facts in mitigation may include, but shall not be limited to, the following: (i) The defendant has no significant history of prior criminal activity, or (ii) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance or (iii) the victim was a participant in the defendant's conduct or consented to the act, or (iv) at the time of the commission of the capital felony, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired; or (v) the age of the defendant at the time of the commission of the capital offense.

*shown,* the court may set aside the sentence of death and impose a sentence of imprisonment for life." (Emphasis added.) In non-capital cases, this qualifying language is not present. Bassett contends that in non-capital cases a trial court has an unlimited discretion in reducing or altering the penalty. He complains that Code § 19.2-264.5 unconstitutionally discriminates against him because its "good cause" provision imposes upon him a heavier burden in reducing a capital verdict than in reducing a non-capital verdict.

We do not accept this argument. No jury verdict is subject to the trial judge's unlimited discretion. The phrase "upon good cause shown" merely reiterates the rule applicable in all cases, misdemeanor, felony, or capital, when the court must consider altering a jury verdict. The same criterion applies in capital as well as non-capital cases.

Bassett argues further that the trial court improperly exercised its discretion in refusing to reduce his sentence to life imprisonment. We disagree. The trial judge had heard the evidence twice and was thoroughly familiar with the facts. His remarks at sentencing show that he recognized the aggravating factors and looked for mitigating factors, but found none. We affirm his action as a proper exercise of discretion.

### XVIII. *Appropriateness of Penalty.*

Bassett argues that his jury must have been impassioned or prejudiced to return the death sentence. He points out the first trial of this case resulted in a mistrial because the jury could not agree on a verdict. Further, he asserts that the only time a Henrico County jury has ever imposed this sentence is for multiple murders. He says that to apply this penalty in a single murder case shows that passion or prejudice influenced the jury's decision. We disagree. The record reveals no indication that passion, prejudice, or any other arbitrary factor affected the jury's determination.

Bassett also alleges that his death penalty is excessive or disproportionate to penalties imposed in similar death penalty cases recently before this court.[6] We find no support for his contention. Considering both the crime and the defendant, we are of

---

[6] *James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 273 S.E.2d 57 (1980) (defendant and three others robbed, then shot husband, wife, and their five-year-old son in the head as they lay bound, gagged, and covered with sheets).

opinion that Bassett's murder of Burwell equals the atrocity found in the cases cited by Bassett.

Finding no reversible error in the court below, we will affirm the verdict of guilty and the sentence of death.

*Affirmed.*

*Linwood Earl Briley* v. *Commonwealth,* 221 Va. 532, 273 S.E.2d 48 (1980) (Defendant and three others robbed and shot the victim, leaving his body partially submerged in the James River).

*Turner* v. *Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980) (defendant robbed a jewelry store and shot the owner once in the head and twice in the chest for setting off the silent alarm).

*Clark* v. *Commonwealth,* 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied,* 444 U.S. 1049 (1980) (defendant, an assassin, shot victim at point blank range, then departed with victim's money).