CARLTON JEROME POPE

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 861109 and 861110

September 4, 1987

Present: All the Justices

*Gordon B. Tayloe, Jr.; William R. Brown (Cooper & Davis, P.C.,* on brief), for appellant.
*Margaret Poles Spencer, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

Carlton Jerome Pope was convicted by a jury of capital murder (Code § 18.2-31(d)), robbery, malicious wounding, attempted robbery, and four counts of using a firearm in the commission of a

felony. At the conclusion of the first stage of the bifurcated trial, the jury fixed his punishment at life imprisonment for robbery, ten years for attempted robbery, twenty years for malicious wounding, and four years for each of the four firearm offenses. At the penalty stage, the jury heard evidence of the defendant's history and evidence in mitigation. After further deliberation, the jury returned a unanimous verdict fixing Pope's punishment at death for capital murder, based on the "future dangerousness" predicate of the statute. After reviewing a pre-sentence report and after a further hearing, the court entered judgment on the jury verdicts by final orders entered September 3, 1986. Pope's appeal of his capital murder conviction has been consolidated with the automatic review of his death sentence required by Code § 17-110.1. We have also certified from the Court of Appeals of Virginia the record of Pope's related convictions, pursuant to Code § 17-116.06, and have given all the related appeals priority on our docket.

## I. THE EVIDENCE

Pursuant to established principles of appellate review, the evidence will be stated in the light most favorable to the Commonwealth. On the evening of January 12, 1986, Marcie Ann Kirchheimer was a passenger in the front seat of a two-door "little Sunbird" owned and driven by her sister, Cynthia Gray. Cynthia drove to "Nick's Pool Hall" in downtown Portsmouth in search of a man named James Taylor. When they arrived, Marcie left the car and knocked on the door of the pool hall, but found the establishment closed. As Marcie returned to the car, Pope, who was across the street, called to them to ask if they were looking for Taylor. He walked to the car, identified himself as "Carl," and told them that Taylor had left the pool hall.

Pope asked Cynthia if she would give him a ride home. She agreed, and Pope got into the back seat of the car, where he sat on the right side, behind Marcie. Cynthia first drove to James Taylor's mother's house, where Marcie left the car to talk with Taylor's mother for a few minutes. Taylor was absent, and Marcie told his mother that they would return in ten or fifteen minutes. Marcie then rejoined Cynthia and Pope in the car. Pope directed Cynthia to Bagley Street. During the drive, Cynthia was drinking from a bottle of wine. She passed the bottle back to Pope, who also drank from it.

When the car arrived at Bagley Street, Pope told Cynthia to stop on the left side, "the wrong side of the road as [they] were travelling." Marcie opened the passenger door and pulled the seat forward to let Pope out. Immediately after emerging from the car, Pope turned toward the women, pointed a pistol at them, and said, "give me all your money." Startled, the women made no immediate response and Pope fired a shot into Cynthia's head. Marcie reached up and grappled with Pope for the gun. Pope "pulled free" and "started to run off, and took two or three steps off, and turned around." Pope then shot Marcie in the back of the head and "took off running."

Cynthia was bleeding from the head and was slumped over the steering wheel. Marcie, knowing that she, too, had been shot, "halfway sat on [Cynthia] in the middle of the car," turned on the car's emergency blinkers and drove as fast as she could to Portsmouth General Hospital. Marcie drove to a door she thought was the emergency entrance, jumped out of the car and ran to the door. Finding the door locked and that entrance no longer in use, she ran back past Cynthia's car and entered the front lobby of the hospital. There, she encountered two police officers, William Mutter and George Vick. The officers heard Marcie's screams and followed her as she ran back to the car. They found Cynthia dead from a gunshot wound to the right temple. The bullet had passed through the brain and exited in front of the left ear. Marcie was admitted to the hospital. She had a bullet wound behind the right ear. The same bullet had subsequently passed through her left shoulder and exited under her left arm. Later, in court, Marcie positively identified Pope as the assailant.

Upon arriving at the car, the police officers called for assistance and preserved the condition of the car until it could be examined. The wine bottle from which Cynthia and Pope had been drinking was found on the driver's seat and was turned over to a fingerprint examiner who found that it bore a print which positively matched a fingerprint taken from Carlton Pope.

Marcie had had no purse, and testified that Pope had taken nothing from her, but Cynthia's purse was missing after the shooting. Cynthia had been carrying a clutch-type purse with a zipper closure which she left open. It was lying "right in between the bucket seats" as the women drove to Nick's Pool Hall. During that drive, Cynthia took her checkbook out of the purse momentarily and then replaced it in the purse, which remained between the

bucket seats. After the shooting, the purse was missing but the police found the checkbook on the floor of the car between the passenger seat and the door on the passenger side, through which Pope had left the car. Marcie testified that it was not Cynthia's practice to leave the checkbook on the floor or to leave "things like that strewn about the car." Marcie last saw the purse between the bucket seats, and did not see it after the shooting. While she did not see Pope remove it, she testified that it was in his view and that he had ample opportunity "to grab it without me seeing him."

## II. PRE-TRIAL MOTIONS

### A. *Motion for Private Investigator*

■ Before trial, Pope moved the court to appoint an investigator to "comb the neighborhood" for potential witnesses. The court denied the motion, noting that we have recently held that an indigent defendant has no constitutional right to the appointment, at public expense, of a private investigator. *Gray* v. *Commonwealth*, 233 Va. 313, 330, 356 S.E.2d 157, 166 (1987); *Watkins* v. *Commonwealth*, 229 Va. 469, 478, 331 S.E.2d 422, 430 (1985), *cert. denied*, 475 U.S. 1099 (1986); *Quintana* v. *Commonwealth*, 224 Va. 127, 135, 295 S.E.2d 643, 646 (1982), *cert. denied*, 460 U.S. 1029 (1983). On appeal, Pope argues that the appointment of a private investigator is required by an analogy to the reasoning in *Ake* v. *Oklahoma*, 470 U.S. 68, 83-84 (1985). We do not agree. *Ake* applies only to the appointment of an independent psychiatrist to assist an indigent defendant who has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor in his defense, or where the prosecution intends to rely on psychiatric evidence to prove the defendant's future dangerousness. *See Pruett* v. *Commonwealth*, 232 Va. 266, 275 n.3, 351 S.E.2d 1, 7 n.3 (1986); *Tuggle* v. *Commonwealth*, 230 Va. 99, 104-108, 334 S.E.2d 838, 841-43 (1985), *cert. denied*, 478 U.S. 1010 (1986). *Ake* is inapplicable here. We adhere to our holding in *Watkins*.

### B. *Motion for Personal Inspection of Evidence by Defendant*

■ Pope moved the court to permit him personally to inspect the Commonwealth's evidence before trial. The court ruled that defense counsel was entitled to view the physical evidence, but

that the defendant was not entitled to be present. When an accused is represented by counsel, the requirements of Rule 3A:11, as we construe it, are satisfied when defense counsel is afforded the opportunity to inspect the Commonwealth's evidence. The record shows that defense counsel took full advantage of his opportunity to inspect the physical evidence before trial. No authority is cited, and none exists in Virginia, for the asserted right of a defendant, who is represented by counsel, to inspect the evidence personally.

## C. *Motion for Change of Venue*

Pope made pre-trial motions for a change of venue and for sequestration of the jury, based on pre-trial publicity in Portsmouth concerning the offense. The court took the motions under advisement until *voir dire* had been completed in order to determine whether the veniremen had been affected by the publicity. After *voir dire* questioning disclosed that the publicity had had no substantial impact on the veniremen, the court denied both motions.

The court was able to select twenty prospective jurors and four alternates from thirty-three veniremen. Of the nine veniremen excluded on *voir dire*, eight were excused for reasons unrelated to pre-trial publicity and one had personal knowledge of the details of the case. Of the twenty-four remaining prospective jurors, six had been exposed to publicity concerning the case, but none of these was sensible of any bias toward the accused, none had formed an opinion of guilt or innocence, and all stated their willingness to decide the case solely upon the law and the evidence.

█ The relative ease with which an impartial jury was empaneled negates the "widespread prejudice" which a defendant must show in order to justify a change of venue. *See Stockton* v. *Commonwealth*, 227 Va. 124, 137, 314 S.E.2d 371, 380, *cert. denied*, 469 U.S. 873 (1984). The presumption is that the defendant can receive a fair trial in the locality in which the offense occurred, and the defendant has the burden of showing "widespread prejudice" to rebut that presumption. *Id.* There is no showing on appeal that the trial court abused its discretion in denying a change of venue.

## D. *Motion for Sequestration*

█ Code § 19.2-264 provides that in felony cases "the jury shall not be kept together unless the court otherwise directs." Sequestration is not mandated by the mere fact that the offense has received coverage in the news media. *Stockton*, 227 Va. at 138, 314 S.E.2d at 380. The defendant offers no evidence of prejudice resulting from the court's denial of his motion for sequestration, and the record shows no prejudice. We find no abuse of the court's discretion in denying the motion.

## E. *Motion to Suppress*

█ Pope moved the court to suppress the evidence of the wine bottle upon which his fingerprint was found, contending that the Commonwealth had failed to show a complete chain of custody from the car to the fingerprint examiner. The Commonwealth is not required to exclude every conceivable possibility of substitution, alteration, or tampering. *P. Smith* v. *Commonwealth*, 219 Va. 554, 559, 248 S.E.2d 805, 808 (1978). All that is required in order to establish a chain of custody is that the Commonwealth's evidence "afford reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained." *Id.*

The evidence here was more than sufficient to carry that burden. Marcie testified that the wine bottle was on the front seat of the car, between Cynthia's legs, before the shooting. When Cynthia's body was found in the car parked at the hospital, Officer Vick "preserved the scene" until Officer Armstrong arrived. Armstrong found the bottle in the front seat of the car, still between Cynthia's legs. Armstrong removed the bottle, placed it on the sidewalk, and stood over it until Detective Harris arrived. Harris took the bottle into custody, took it to the fingerprint examiner, and kept it in his possession thereafter until trial. The court correctly denied the motion to suppress.

## F. *Constitutionality of Death Penalty*

█ Pope raised at trial, and raises again on appeal, a challenge to the constitutionality of Code §§ 18.2-31 and 19.2-264.2-5. He contends that Virginia's death penalty statutes provide for cruel and unusual punishment, that they are vague and overbroad, and that there is no rational basis for the legislative classification of

capital offenses. We have considered and rejected these and similar claims in *Gray* v. *Commonwealth*, 233 Va. 313, 320, 356 S.E.2d 157, 160 (1987); *Beaver* v. *Commonwealth*, 232 Va. 521, 527, 352 S.E.2d 342, 344-45 (1987); *Stockton*, 227 Va. at 134-35, 314 S.E.2d at 378; *Whitley* v. *Commonwealth*, 223 Va. 66, 77-78, 286 S.E.2d 162, 168-69, *cert. denied*, 459 U.S. 882 (1982); *Bassett* v. *Commonwealth*, 222 Va. 844, 851, 284 S.E.2d 844, 849 (1981), *cert. denied*, 456 U.S. 938 (1982); *Martin* v. *Commonwealth*, 221 Va. 436, 439-40, 271 S.E.2d 123, 125-26 (1980); *Clark* v. *Commonwealth*, 220 Va. 201, 212, 257 S.E.2d 784, 791 (1979), *cert. denied*, 444 U.S. 1049 (1980); and *M. Smith* v. *Commonwealth*, 219 Va. 455, 476-78, 248 S.E.2d 135, 148-49 (1978), *cert. denied*, 441 U.S. 967 (1979). We adhere to those holdings.

## III. TRIAL, GUILT PHASE

### A. *Motions Relating to Jury*

At the beginning of the trial, Pope moved the court to empanel two separate juries, one to try the guilt phase and the other to determine his penalty in the event of conviction. When the court denied that motion, Pope moved the court to try the entire case without a jury. The Commonwealth opposed the motion and the court denied it.

▮ The court correctly denied both motions. We held in *Pruett*, 232 Va. at 277, 351 S.E.2d at 7-8, and in *Watkins*, 229 Va. at 479, 331 S.E.2d at 431, that Code § 19.2-264.3 requires that the same jury determine both guilt and punishment and that this statutory procedure is constitutional. We reaffirm those holdings. Code § 19.2-257 provides that an accused person who pleads not guilty may, with the advice of counsel, waive jury trial and may be tried by the court without a jury, but only with "the concurrence of the attorney for the Commonwealth and of the court entered of record." Thus, a jury may be waived only with the consent of the defendant, the Commonwealth, and the court. The statutory requirement of consent by the Commonwealth and by the court does not violate any constitutional right of the defendant. *Vines* v. *Muncy*, 553 F.2d 342, 345-46 (4th Cir.), *cert. denied*, 434 U.S. 851 (1977) (applying Virginia law).

## B. *Voir Dire*

During his *voir dire*, Glen Latham, a prospective juror, indicated by his answers that he believed that the defendant was required to prove his innocence. Defense counsel then asked him whether he could accept the court's instructions that the defendant was presumed innocent until the Commonwealth proved him guilty beyond a reasonable doubt. The juror answered that he did not understand the question. The court then questioned him directly and he responded: "Yes, sir. I may sound contradictory, but I feel, if he can't prove his innocence, I feel it's up to the Court to prove he is guilty, then." A further confused explanation followed. Defense counsel repeated the original question, and the juror responded that he did not know "how to answer" because he was not "familiar with this procedure." The Commonwealth's attorney then examined him as follows:

Q. Let me try to clarify something Mr. Tayloe was asking you:
    You understand the burden of proof in this case is upon the Commonwealth?
A. Yes.
Q. The Commonwealth has to prove Mr. Pope's guilty beyond a reasonable doubt?
A. Yes.
Q. You understand he has no burden to produce any evidence?
A. Yes. I realize he doesn't have to.
Q. He has no burden to prove himself innocent?
A. Yes. I understand that. I maybe might have gotten mixed up in questioning about it.
Q. The burden is on the Commonwealth, and he has no burden to come forward and prove his innocence. Can you accept that and live with that proposition as the law in this case?
A. Yes.

The trial court properly evaluated Latham's *voir dire* in its entirety in ruling on Pope's challenge for cause. *Wise* v. *Commonwealth*, 230 Va. 322, 325-26, 337 S.E.2d 715, 717-18 (1985), *cert. denied*, 475 U.S. 1112 (1986). Because the trial judge has the opportunity, which we lack, to observe and evaluate the apparent

sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand, the trial court's exercise of judicial discretion in deciding challenges for cause will not be disturbed on appeal, unless manifest error appears in the record. *Calhoun* v. *Commonwealth*, 226 Va. 256, 258-59, 307 S.E.2d 896, 898 (1983). The record here gives no support to Pope's contention that the trial court abused its discretion.

Pope also challenged Tricia Clifford, a prospective juror, who was employed as a purchasing agent for Portsmouth General Hospital. On *voir dire*, she testified that she had heard some of the details of the case from "gossip through the hospital." She also stated that this information would not affect her impartiality, that she would remove "work gossip" from her mind and that she would "only accept that evidence which is from the witness stand." Considering her *voir dire* in its entirety, the court denied the challenge, and we uphold its ruling. We held in *Washington* v. *Commonwealth*, 228 Va. 535, 323 S.E.2d 577 (1984), that it is not necessary that prospective jurors be entirely ignorant of the facts and issues in the case. "It is sufficient if they can lay aside their impressions or opinions and render a verdict based on the evidence presented in court." *Id.* at 544, 323 S.E.2d at 584.

## C. *Sufficiency of Proof of Robbery*

Pope argues that the evidence was insufficient to support his conviction of robbery, and consequently was insufficient to establish the predicate for capital murder under Code § 18.2-31(d), which classifies as capital those killings which are perpetrated "in the commission of robbery." The Commonwealth's evidence of robbery was circumstantial, based on the theory that Pope took Cynthia's purse. He contends that the evidence fails to exclude two reasonable hypotheses of innocence: (1) that someone other than Pope entered the car and removed Cynthia's purse from the area between the bucket seats while Marcie was running for help at the hospital; and (2) that Pope himself removed the purse surreptitiously before the shooting and concealed it on his person. In that event, he says, his underlying offense would be mere larceny, rather than robbery.

Pope's first hypothesis framed a factual issue for determination by the jury. In that connection, the jury was entitled to consider the distance Marcie ran and the length of time the car, containing Cynthia's body, was out of her view. Officer Vick testi-

fied that he ran the same route, which Marcie had covered at the time of the crime, in 27.8 seconds. The jury was entitled to conclude from the evidence, as it did, that Pope's hypothesis that a stranger stole the purse during that interval was neither reasonable nor persuasive.

██ Pope's second hypothesis is fallacious as a matter of law. We decided in *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied*, 451 U.S. 1031-1032 (1981), that where a killing and a taking of property are so closely related in time, place, and causal connection as to make them parts of the same criminal enterprise, the predicates for capital murder under Code § 18.2-31(d) are established. Further, these relationships need not necessarily be jury questions. They may, in a proper case, be determined as a matter of law. 221 Va. at 543-44, 273 S.E.2d at 55-56. *See also LeVasseur* v. *Commonwealth*, 225 Va. 564, 590-92, 304 S.E.2d 644, 658-59 (1983), *cert. denied*, 464 U.S. 1063 (1984); *Haskell* v. *Commonwealth*, 218 Va. 1033, 1043-44, 243 S.E.2d 477, 483 (1978). The trial court's rulings here implicitly adopted the view that the taking of the purse, the killing of Cynthia, its owner, and the wounding of Marcie, the only other person in a position to resist the taking, were so closely related in time, place, and causal connection as to constitute a common criminal enterprise as a matter of law. We uphold that ruling.

## D. *Evidentiary Rulings*

██ Pope challenges five evidentiary rulings at trial: the court's admission of photographs of Cynthia's body, of the scene of the crime, the car, the wine bottle, and the hospital, as well as admission of Marcie's jacket containing bullet holes. Pope also objected to the introduction in evidence of the wine bottle itself and the checkbook. He argues on appeal that these exhibits are non-probative, that they duplicate the previous testimony of Marcie, and that they are inflammatory. These contentions are entirely without merit. The exhibits are relevant to the issues at trial, probative of the Commonwealth's theory of the case, corroborative of the other evidence, and no more likely to inflame the jury than oral descriptions of the circumstances of the crime. Their admission was within the court's discretion. *Wise*, 230 Va. at 330, 337 S.E.2d at 720.

■ Pope objected at trial to Officer Vick's testimony that he had run over the same route that Marcie had run at the hospital, in order to measure the elapsed time required. As noted above, this evidence was relevant to refute the reasonableness of Pope's hypothesis that another person might have stolen Cynthia's purse while Marcie was out of the car. Pope argues that the evidence should have been excluded because of differences between Vick's and Marcie's strength and physical condition. We disagree. Those differences affect the weight of the evidence rather than its admissibility. *See Washington*, 228 Va. at 552, 323 S.E.2d at 588-89.

■ Pope argues on appeal that the trial court erred in precluding him from introducing evidence that James Taylor had a reputation as a drug dealer and that Nick's Pool Hall had a reputation as a place where drugs are distributed. He contends that this evidence would assist his efforts to impeach Marcie. Marcie had testified that although she was a user of drugs, she and Cynthia did not come to Portsmouth to buy drugs, and that she did not know Taylor was a drug dealer. Marcie testified that she had known Taylor and his mother for ten years and that Cynthia worked in Portsmouth and frequently took Taylor's mother, who had no car, to stores and on other errands. Marcie was never cross-examined concerning any knowledge of the reputations either of Taylor or of the pool hall. Consequently, the reputation evidence Pope sought to introduce would not have impeached Marcie's testimony in any respect. The court correctly excluded it as irrelevant.

## IV. TRIAL — PENALTY PHASE

### A. *Evidence of Parole Status*

During the penalty phase of the trial, Pope objected to evidence offered to show that he was, on the date of the offense, free on parole from a penitentiary sentence imposed for a prior crime. Pope concedes that his prior criminal record was admissible, and that prior unadjudicated criminal conduct might be used at the penalty phase to prove future dangerousness. He argues, however, that the parole system is "not part of a criminal prosecution, but is part of a separate administrative system," and that his parole status was therefore irrelevant.

■ The objection was without merit. Code § 19.2-264.4 requires the jury, as a prerequisite to imposition of the death penalty based on the "future dangerousness" predicate, to consider

the "prior history" of the defendant. We upheld the constitutionality of that section in *LeVasseur*, 225 Va. at 593-94, 304 S.E.2d at 660, and in *Smith*, 219 Va. at 477-78, 248 S.E.2d at 148-49. We relied on the reasoning of *Jurek* v. *Texas*, 428 U.S. 262 (1976): "What is essential is that the jury have before it *all possible relevant information* about the individual defendant whose fate it must determine." *Id.* at 276 (emphasis added). In *Bassett*, 222 Va. at 852, 284 S.E.2d at 849, we held that future dangerousness could reasonably be inferred from the fact that a defendant had committed additional crimes within six months of his release on parole from a 99-year sentence for armed robbery. That fact, we noted, tended to show a predisposition to commit other crimes upon release from custody. The evidence here is equally relevant and probative on the issue of future dangerousness. In addition to showing a predisposition to commit acts of increasing violence after punishment for earlier crimes, it demonstrates that Pope was undeterred by the constraints of parole supervision. The court correctly overruled Pope's objection.

### B. *Passion and Prejudice*

On appeal, Pope contends that the "cumulative effect of the trial court's erroneous rulings and the overzealousness of the Commonwealth's Attorney so inflamed the passion and prejudice of the jury to cause them to award the death penalty." Because we have found no error in the trial court's rulings, we reject Pope's cumulative-effect argument. *See Wise*, 230 Va. at 335, 337 S.E.2d at 723. Pope does not specify, nor does our independent review of the record disclose, any showing of prosecutorial "overzealousness."

### C. *Excessiveness and Proportionality*

Pope argues, finally, that the death penalty, as applied here, is excessive and disproportionate to the penalty imposed in other capital murder cases. At the penalty phase of the trial, Pope's mother testified that he had had attendance and discipline problems in school as an adolescent, and that he dropped out of school and began having "problems with the law." His parole officer testified that Pope had been convicted of four misdemeanors when he was 18 years old: unlawful concealment of property, two petit larceny convictions, and carrying a concealed weapon. At the

age of 19, Pope was convicted of felonious assault and use of a firearm in the commission of a felony. He was sentenced to eight years for the shooting and two years for the firearm offense. He served 29 months of those 10 years, was released on parole in October 1985, and committed the present crimes three months later while still on parole. Pope's criminal record demonstrated an escalating tendency toward violence.

The jury heard the testimony of Pope's parents, who testified that he could become a good citizen; a corrections officer, who testified that Pope had been a good prisoner; and a psychiatrist, who opined that although Pope acted on impulse and did not know "how to handle circumstances" he could nevertheless "function adequately in a structured environment." The jury also properly took into account the unprovoked and sudden nature of the violence Pope employed on the two victims in this case, who were unarmed and constituted no threat to him, as well as the unnecessary degree of deadly force he chose to employ to accomplish his purpose of robbery and to quell resistance. There was sufficient evidence before the jury to support its conclusion that there was "a probability . . . that he would commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.4(C).

Pursuant to the requirements of Code § 17-110.1(C), we have reviewed the record and have determined that the sentence of death was neither imposed under the influence of passion, prejudice, or any other arbitrary factor, nor is it excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. In making the latter determination, we have accumulated and reviewed the records in all capital murder cases reviewed by this Court since the present statutes became effective, giving particular attention to those cases in which the death penalty was based solely upon the "future dangerousness" predicate, *i.e., Peterson* v. *Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983); *Bassett* v. *Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982); *Evans* v. *Commonwealth*, 222 Va. 766, 284 S.E.2d 816 (1981), *cert. denied*, 455 U.S. 1038 (1982); *Giarratano* v. *Commonwealth*, 220 Va. 1064, 266 S.E.2d 94 (1980); and *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980). From that review,

we are satisfied that juries in Virginia generally impose the death penalty in similar cases.

Finding no error in the record, we decline to commute the death sentence and will affirm the several convictions and the judgments appealed from.

*Affirmed.*