COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Alston, McCullough and Senior Judge Clements
Argued at Chesapeake, Virginia


BRANDON RASHAD JONES

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0448-12-1          JUDGE STEPHEN R. McCULLOUGH
                                                    DECEMBER 3, 2013

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Karen J. Burrell, Judge

J. Barry McCracken, Assistant Public Defender (Office of the Public
Defender, on brief), for appellant.

Benjamin H. Katz, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Brandon Rashad Jones argues that his convictions for possession of cocaine with the intent

to distribute and possession of a firearm while possessing cocaine with the intent to distribute must

be reversed on three grounds.  First, he contends that the trial court erred in admitting the certificate

of analysis because the Commonwealth failed to establish a proper chain of custody.  Second, he

claims that "[t]he trial court erred in considering the signature on the Request for Laboratory

Examination, submitted by a Norfolk police officer, of a non-testifying employee of the [laboratory]

in conjunction with [the] subsequently prepared certificate of analysis to establish the internal chain

of custody at the laboratory . . . in violation of the Defendant's right to confront witnesses."  Finally,

he argues that the evidence against him is insufficient.  We disagree and affirm his convictions.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

I. THE TRAFFIC STOP

On December 21, 2009, around 11:00 p.m., Norfolk police stopped a vehicle with expired tags. Three persons were in the vehicle: the driver, a passenger in the front seat named Johnny B. Sharp, and appellant, who was the only passenger in the back seat. Appellant was seated in the middle of the back seat. Appellant was speaking on the phone. Officer D.J. Chaney overheard appellant say into the phone, "[t]he police have stopped us off Lafayette." Officer Chaney asked him to end the conversation, and appellant pretended to do so before switching the phone to his other ear. Officer Brian Jones noticed that appellant was slouched down in the center of the back seat and had his legs spread out so that his right leg was pressed against the map pocket on the back of the front passenger seat. He noticed that the pocket "was moving in a front to backward motion opening and closing" as appellant moved his legs back and forth. Officer Jones shined his flashlight down into the map pocket and observed the grip of a handgun. He immediately warned his partner, Officer Chaney, about the gun, and all three of the vehicle's occupants were removed from the vehicle.

After securing the passengers, Officer Chaney looked inside the map pouch behind the front passenger seat. He observed a handgun and a plastic bag in the map pocket. While wearing gloves, he took the plastic bag out and observed what he believed to be narcotics. Officer Chaney returned the narcotics to the map pocket and called the narcotics division. Soon afterwards, Officer Jones picked up the bag of suspected drugs and placed it to the right of where appellant had been seated during the traffic stop. Once appellant was removed from the back seat, Officer Jones noticed that the map pocket would just hang open.

Neither officer observed any liquid stains in the area of the back seat. In addition, appellant was not sweating or drooling. Officer Chaney did not observe any stains on appellant's pants. The

- 2 -

police cruiser's spotlight as well as its headlights were trained on the stopped vehicle. While looking inside the vehicle, Officer Chaney used his flashlight, which he described as "very bright."

## II. THE CHAIN OF CUSTODY

Chaney and Jones contacted the narcotics division. Later, while still at the scene, they turned over the drugs to Investigator Juvenal Valdez of the Norfolk police's Vice and Narcotics Department. Investigator Valdez took the bag of suspected drugs with him to the police station. Once there, he took the items out of the bag and placed them on a table. After weighing and measuring them, he photographed them. He then returned them to the bag. Following a preliminary test of the items, he placed the items in a manila envelope, put the package in his evidence locker and locked the door. This locker is specifically assigned to Investigator Valdez, and he is the only one who has the key. At the time, there were no other drugs or items from any other case in the locker. Investigator Valdez also obtained a DNA sample from appellant, a buccal swab, in the early hours of December 22. After swabbing appellant's mouth, Investigator Valdez returned the Q-tip to its container and sealed it. He also stored that item in his locker. Investigator Valdez wore latex gloves both when he took the buccal swab and when he handled the narcotics.

On December 29, 2009, Investigator Valdez took the package containing the suspected drugs out of the locker and took it to the police department's property and evidence section. He received a specific evidence voucher, number 09008824. That same day, he took the package to the lab for analysis. Six and a half weeks later, he submitted the swab he had obtained from appellant for DNA analysis to the lab.

All of the drugs recovered from the stopped vehicle were contained within one bag. This one plastic bag contained two additional plastic bags, each of which contained individually wrapped rocks of cocaine. There were six rocks of cocaine in one bag and ten in the other. The rocks of cocaine were individually wrapped. The wrapping consisted of a torn-off corner of a plastic baggy.

- 3 -

There were additional empty plastic bags along with the bags which contained cocaine. Investigator Valdez estimated that there were two or three of these empty bags. On the request for laboratory examination form, Investigator Valdez indicated that he was submitting 16 "clear plastic baggies containing white hard substance" as well as "clear plastic baggi[e]s." He testified that he submitted "everything": the baggies containing cocaine and the empty baggies. He noted that a specific laboratory number was given to the items he submitted: T09-11004.

Susan Stanitski, the director of the Eastern Laboratory of the Department of Forensic Science, testified concerning laboratory procedures. She explained that when the police drop off an item of evidence for testing by the lab, a custodian will assign a specific number to items of evidence that are associated with a particular case. The custodian will sign a form, as would the officer who is delivering the item. Stanitski noted that the person who signed for the item of evidence, Allen Evans, is an employee of the laboratory. Counsel for the defendant objected to "all hearsay regarding anything that Mr. Allen Evans would have done." He also raised a Confrontation Clause objection. The court overruled both objections. Stanitski testified that the standard procedure is that the lab will not accept any evidence that is not in a sealed condition. Stanitski further testified that after the evidence is accepted, it is placed into a storage vault. The only persons who have access to the evidence, Stanitski explained, are the evidence custodians, the laboratory director, and a supervisor. The scientist who is conducting the analysis will later request the evidence in a particular case, either personally or via e-mail. The custodian will then retrieve the evidence and deliver it to the analyst. Stanitski testified that there was no indication that these standard practices had not been followed.

Stanitski received the evidence for laboratory number T09-11004 and noted that it was in a sealed condition. She tested five of the rocks submitted and concluded that they were cocaine. She then generated a certificate of analysis reflecting the results of her test. She noted on the certificate

- 4 -

that there were "[t]wo plastic bags containing a total of 16 plastic bag corners containing off-white material." Stanitski explained that

> what actually was inside that outer container or outer plastic bag was one bag, one plastic bag. That actually had two of the plastic bags, which I described, and then in each of those plastic bags were individual plastic bag corners totaling 16. There were six plastic bag corners in one of them and ten in another.

When asked why she did not list the "one plastic bag" which "housed everything" on the certificate, Stanitski testified that it is mandatory to list the inner packaging, but that the analyst has discretion with regard to how to describe the other items.

Defense counsel cross-examined Stanitski about procedures for testing a potential drug sample when a DNA test also has been requested. She explained that the laboratory procedures call for the analyst who is performing the drug analysis in such a situation to wear glasses, a hair net, and a face mask. The purpose of these precautions is to prevent the analyst's DNA from contaminating the evidence. She did not wear these items because there was no indication that the items were to be tested for DNA. The request for DNA analysis arrived after Stanitski had completed her analysis. Stanitski did, however, wear gloves during her examination of the evidence.

Don Michael Cunnius, a forensic scientist in the DNA section at the Virginia Department of Forensic Science, performed the DNA analysis on the evidence submitted by Investigator Valdez. He reported at trial and on the certificate of analysis admitted at trial that he received "two plastic bags containing a total of 16 plastic bag corners." The unique lab number was listed as T09-11004. However, during his testimony and further down the certificate of analysis, he stated that he obtained the DNA sample from swabbing 19 plastic bags, one more than the 16 plus two that he reported receiving for testing. He explained the apparent discrepancy on cross, stating that "[s]ince

- 5 -

[he] was examining the same item, [he] had to keep [his description] consistent with [Stanitski's] description."

Cunnius testified that appellant could not be eliminated as a major contributor to a DNA mixture profile obtained from the nineteen plastic bags. A mixture means that appellant's DNA was mixed with DNA from another individual. The front passenger, Johnny B. Sharp, was eliminated as a contributor to the mixture. The term "major contributor" means that it is the largest profile found in the mixture. Cunnius testified that the probability of randomly selecting an unrelated individual with a DNA profile matching the major profile developed from the plastic bags is one in greater than 6.5 billion.

Cunnius concluded that it would be "highly unlikely" for DNA to transfer from a car seat, where a "normally clothed individual" had been seated, onto a plastic bag that is placed onto this car seat. He also testified that this scenario would not explain the large quantity of DNA recovered from the evidence. Cunnius explained that the possibility of a transfer in such a scenario would increase if there were a wet stain on the seat.

Investigator J.V. Natiello testified as an expert in the use and distribution of drugs. According to Natiello, the way in which the drugs were packaged, as well as the absence of any smoking device, were facts not consistent with personal use. Finally, the firearm recovered was submitted for fingerprint analysis. No fingerprints were found on the gun.

Appellant was charged with possession of cocaine with the intent to distribute and possession of a firearm while possessing cocaine with the intent to distribute. Following a jury trial, he was found guilty. He was sentenced to a total of eight years in prison.

ANALYSIS

I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WITH REGARD TO CHAIN OF CUSTODY.

Appellant argues that the Commonwealth failed to establish a proper chain of custody with regard to the plastic bags. Although the prosecution is required to establish every "vital link in the chain of possession" when introducing the results of forensic analysis, Robinson v. Commonwealth, 212 Va. 136, 138, 183 S.E.2d 179, 180 (1971), the Commonwealth need not eliminate "'all possibility of tampering.'" Id. (quoting People v. Riser, 305 P.2d 1, 10 (Cal. 1957)). "All that is required . . . to establish a chain of custody is that the Commonwealth's evidence 'afford reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained.'" Pope v. Commonwealth, 234 Va. 114, 121, 360 S.E.2d 352, 357 (1987) (quoting Smith v. Commonwealth, 219 Va. 554, 559, 248 S.E.2d 805, 808 (1978)). "'[G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.'" Aguilar v. Commonwealth, 280 Va. 322, 332-33, 699 S.E.2d 215, 220 (2010) (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n.1 (2009)). We will not overturn a trial court's determination with regard to the adequacy of chain of custody absent an abuse of discretion. Pope v. Commonwealth, 60 Va. App. 486, 511, 729 S.E.2d 751, 763 (2012).

Appellant argues that "[t]he most glaring inconsistency [in the chain of custody] is the failure to account for the number of bags actually seized by [Investigator] Valdez at the outset and the changing posture of the bags as they moved through the process of being inventoried and processed by the police department and laboratory." In fact, the record reveals a fairly straightforward explanation for the alleged inconsistencies: some witnesses provided more complete inventories of the bags which were found at the scene of the traffic stop in their testimony and in the documents they prepared, while other witnesses chose not to mention the bags that were either empty or contained the baggies with drugs.

Ms. Stanitski provided perhaps the most comprehensive overview of the evidence in her testimony at trial, mentioning the "one plastic bag" which "housed everything," and the two inner plastic bags, one of which contained six individually wrapped rocks of cocaine, and the other of which contained ten. On the certificate of analysis she produced, however, she chose not to include the "one plastic bag" which "housed everything" in the description of the items she analyzed. Cunnius used the same description on the certificate of analysis he produced, but elsewhere on the certificate and at trial he explained that he also tested the additional plastic bag which Stanitski had chosen not to mention. Investigator Valdez listed the 16 individually-wrapped baggies of cocaine— technically, baggy corners—on both the forms he filled out: the voucher form (App. at 24) and the request for laboratory examination form (App. at 318). Additionally, at least on the voucher form, he also listed the one "[p]lastic baggie containing" the individually wrapped narcotics. However, Valdez did not explicitly mention the two inner bags which Stanitski mentioned, one of which contained six of the individually wrapped rocks of cocaine, and the other of which contained ten.

Significantly, all of the witnesses agreed that there were 16 individually wrapped baggies containing suspected, and later confirmed, cocaine. More fundamentally, not only does the testimony of Investigator Valdez, Stanitski, and Cunnius explain why Stanitski and Valdez counted the bags differently, a factfinder on this record could readily conclude that there was no reasonable likelihood of substitution or tampering. Investigator Valdez and Stanitski both testified to the safeguards put into place in the police department and within the lab to protect the evidence and to ensure its integrity.

Appellant also raises the possibility that appellant's DNA may have been deposited on the outer bag when Officer Jones placed the bag on the seat where appellant had been seated. On this record, the factfinder certainly could reject this possibility. First, Jones testified that appellant had not been seated in the spot where he placed the drugs. Second, Cunnius testified that contamination

is unlikely for an individual who is clothed. He also explained that the sort of passive contamination stemming from resting the bag on top of the seat would not account for the amount of DNA he detected on the bags. He did raise the possibility of DNA transfer in the event there were visible liquid stains on the seat. Officers Jones and Chaney, however, both testified that appellant was not sweating on that cold December night and that neither appellant nor the seat were visibly wet.

Stanitski acknowledged that she did not wear a hair net, safety glasses or a face mask due to the lack of any indication that a DNA test had been (or would be) requested. The point of these procedures, however, is to prevent contamination of a sample by DNA from *the analyst*. Appellant does not explain how *his* DNA could have ended up on a sample due to the analyst's failure to wear these items.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting evidence of the results of the drug and DNA analyses.

II. APPELLANT DID NOT SUFFER A CONFRONTATION CLAUSE VIOLATION.

The Sixth Amendment of the United States Constitution recognizes the right of a defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has held that this right is applicable to the States through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965). We review *de novo* the legal question of whether the Confrontation Clause has been satisfied. Michels v. Commonwealth, 47 Va. App. 461, 465, 624 S.E.2d 675, 678 (2006).

Appellant's argument centers on Code § 19.2-187.01, which provides in relevant part that

> [a] report of analysis duly attested by the person performing such
> analysis or examination in any laboratory operated by . . . the
> Department of Forensic Science or any of its regional laboratories
> . . . shall be prima facie evidence in a criminal or civil proceeding
> as to the custody of the material described therein from the time
> such material is received by an authorized agent of such laboratory

until such material is released subsequent to such analysis or examination. Any such certificate of analysis purporting to be signed by any such person shall be admissible as evidence in such hearing or trial without any proof of the seal or signature or of the official character of the person whose name is signed to it. The signature of the person who received the material for the laboratory on the request for laboratory examination form shall be deemed prima facie evidence that the person receiving the material was an authorized agent and that such receipt constitutes proper receipt by the laboratory for purposes of this section.

The statute contains two separate provisions that are relevant to chain of custody: (1) the signature of the analyst is "prima facie evidence" as to the lab's internal chain of custody from the time the material was received by the lab until the time it was released following the analysis and (2) the signature of the person who received the material for the laboratory constitutes "prima facie evidence" (a) that the person who received the material was an authorized agent and (b) that the item was properly received.

The phrase "*prima facie*" literally means "at first sight" or "on first appearance." Black's Law Dictionary 1209 (7th ed. 1999). This term does not connote anything more than a mere evidentiary sufficiency. See, e.g., Virginia v. Black, 538 U.S. 343, 369-70 (2003) (Scalia, J., concurring in part) ("'*Prima facie* evidence of a fact is such evidence as, in judgment of law, is sufficient to establish the fact; and, if not rebutted, remains sufficient for the purpose.'" (quoting 7B Michie's Jurisprudence of Virginia and West Virginia § 32 (1998))). "*Prima facie* evidence is evidence which on its first appearance is sufficient to raise a presumption of fact or establish the fact in question unless rebutted." Commonwealth v. Dalton, 11 Va. App. 620, 623, 400 S.E.2d 801, 803 (1991) (quoting Babbitt v. Miller, 192 Va. 372, 379-80, 64 S.E.2d 718, 722 (1951)).

In Anderson v. Commonwealth, 274 Va. 469, 650 S.E.2d 702 (2007), the Supreme Court upheld Code § 19.2-187.01 against a Confrontation Clause challenge. Appellant argues that Anderson is no longer good law in light of the United States Supreme Court's decisions in

Melendez-Diaz and Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011). Specifically, appellant relies on the statement first made in Melendez-Diaz that "[i]t is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony is introduced must (if the defendant objects) be introduced live." Melendez-Diaz, 557 U.S. at 311 n.1. Appellant also points to Bullcoming. In that case, the analyst who recorded the suspect's blood alcohol level affirmed that "'[t]he seal of th[e] sample was received intact and broken in the laboratory,' that 'the statements in [the analyst's block of the report] are correct,' and that he had 'followed the procedures set out on the reverse of th[e] report.'" 131 S. Ct. at 2710. The prosecution did not call the certifying analyst to testify but, rather, called a substitute analyst who authenticated the certificate as a business record. The United States Supreme Court posed the question before it as follows:

> Does the Confrontation Clause permit the prosecution to introduce
> a forensic laboratory report containing a testimonial certification,
> made in order to prove a fact at a criminal trial, through the
> in-court testimony of an analyst who did not sign the certification
> or personally perform or observe the performance of the test
> reported in the certification.

Id. at 2713. The Court answered that question in the negative. Id. at 2716-17. The Commonwealth, for its part, takes the position that Anderson remains unaffected by Melendez-Diaz and Bullcoming. It argues that Melendez-Diaz involved the introduction of a testimonial statement by an analyst who did not testify at all, and Bullcoming involved testimony from a substitute analyst. The Commonwealth argues that neither problem is present in the case at bar.

We see no need on the facts of this case to decide to what extent Bullcoming and Melendez-Diaz may or may not have abrogated the holding in Anderson because live witnesses established a *prima facie* chain of custody. Investigator Valdez testified that he personally dropped off the drugs for testing at the lab. Stanitski, the lab director – who personally tested the items submitted by Valdez – testified concerning the procedures at the lab. She stated that the

- 11 -

person who signed for the materials on behalf of the lab, Allen W. Evans, was in fact an employee of the lab. Stanitski also testified that she received the materials in a sealed condition. Cunnius testified that "J.H. Johnson," the name that appears on the request form as the person who received the evidence submitted by Investigator Valdez, was Jeffrey Johnson, a custodian for the lab. The same unique record number, T09-11004, as well as the signature of Investigator Valdez, appears on the request for DNA examination, the request for drug analysis, and the certificates of analysis for both the drugs and DNA.

To the extent appellant argues that the live testimony of the lab employee who received the evidence is necessary to satisfy the Confrontation Clause, we disagree. The United States Supreme Court has made it clear that not every person involved in the chain of custody must testify. See Melendez-Diaz, 557 U.S. at 311 n.1 ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case."). Although the court went on to say that the Confrontation Clause requires the prosecution to produce live testimony, id., the prosecution did so in this case.

In short, the prosecution established receipt by the laboratory and a sufficient chain of custody via live witnesses, in full satisfaction of the Confrontation Clause.

III. THE EVIDENCE WAS SUFFICIENT TO ESTABLISH APPELLANT'S GUILT ON THE FIREARM CHARGE.

In his brief, appellant challenges the sufficiency of the evidence for both of his convictions. At trial, however, his motion to strike was limited to the firearm charge. Therefore, we will not consider his argument that the evidence is insufficient to support the conviction for possession of cocaine. See Rule 5A:18.[1]

_____

[1] Counsel for appellant forthrightly acknowledged at oral argument that the sufficiency of the evidence for the distribution of cocaine conviction had not been raised at trial. He likewise acknowledged, correctly, that he cannot obtain relief under our jurisprudence governing the "ends of justice" exception to Rule 5A:18.

- 12 -

On appeal, a reviewing court does not "'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original, citation omitted). Instead, we ask only "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson, 443 U.S. at 319) (emphasis in original). An appellate court is "not permitted to reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), because appellate judges have no authority "to preside *de novo* over a second trial," Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004).

In circumstantial evidence cases, the reasonable doubt standard requires proof "sufficiently convincing to exclude every reasonable hypothesis except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." Commonwealth v. Hudson, 265 Va. 505, 513, 578 S.E.2d 781, 785 (2003). Thus, the principle "does not add to the burden of proof placed upon the Commonwealth in a criminal case." Id. It merely "reiterates 'the standard applicable to every criminal case.'" Pease v. Commonwealth, 39 Va. App. 342, 360, 573 S.E.2d 272, 280 (2002) (*en banc*) (citation and internal quotation marks omitted), aff'd, 266 Va. 397, 588 S.E.2d 149 (2003) (*per curiam* order adopting reasoning of the Court of Appeals).

Code § 18.2-308.4(C) provides that "[i]t shall be unlawful for any person to possess . . . any pistol, shotgun, rifle, or other firearm . . . while committing or attempting to commit . . . the possession with the intent to . . . distribute a controlled substance classified in Schedule I or II of

the Drug Control Act (§ 54.1-3400 et seq.)." The firearm was not on appellant's person. However, "[a] conviction for the unlawful possession of a firearm can be supported exclusively by evidence of constructive possession." Rawls v. Commonwealth, 272 Va. 334, 349, 634 S.E.2d 697, 705 (2006). "Evidence of actual possession is not necessary." Id. It is enough that the circumstances demonstrate that appellant knew of the presence and character of the firearm and kept it "subject to his dominion and control." Id.

Proximity to the firearm and occupancy of the place where it was found are "circumstances probative of possession and may be considered as factors in determining whether the defendant possessed the firearm." Id. at 350, 634 S.E.2d at 705. Here, the firearm was located in close proximity to appellant, within easy reach. The grip of the gun was visible. In addition, and significantly here, the factfinder can consider the connection between firearms and illegal drugs. See Bolden v. Commonwealth, 49 Va. App. 285, 293, 640 S.E.2d 526, 530-31 (2007). Appellant was convicted of possession of cocaine with the intent to distribute. The cocaine was located immediately adjacent to the firearm, and the package of cocaine had appellant's DNA on it. Appellant's link to the drugs distinguishes the present case from Hancock v. Commonwealth, 21 Va. App. 466, 465 S.E.2d 138 (1995), where the only evidence linking the defendant to the firearm was his proximity to the gun. Moreover, in Hancock there were two other passengers in the back seat. Id. at 468, 465 S.E.2d at 139. Here, appellant was the only passenger. Also, there was no evidence in Hancock that the defendant could even see the gun. Id. at 472, 465 S.E.2d at 141. Here, appellant could see the presence of the firearm. Finally, appellant again presses into service his earlier arguments about possible DNA contamination. We reject those arguments for the reasons noted above. We conclude that the evidence was sufficient to establish appellant's knowing possession of the firearm while possessing cocaine with the intent to distribute.

## CONCLUSION

Appellant's convictions are affirmed.

<u>Affirmed.</u>