COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Decker, Judges Humphreys and O'Brien
Argued at Lexington, Virginia

PUBLISHED

NATALIE MARIE KEEPERS

v.       Record No. 0279-19-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE MARY GRACE O'BRIEN
APRIL 14, 2020

FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
Robert M.D. Turk, Judge

David B. Hargett (Hargett Law, PLC, on brief), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


A jury convicted Natalie Keepers ("appellant") of accessory before the fact to murder, in

violation of Code §§ 18.2-18 and -32.  Before her trial, appellant pled guilty to unlawful

concealment of a dead body, in violation of Code § 18.2-323.02.  She does not challenge that

conviction.

Appellant asserts the following assignments of error:

  1.  The trial court erred in denying the motion to suppress the
      pre-warning and post-warning statements [appellant] made to
      law enforcement over the course of two days.

  2.  The trial court erred in denying [appellant's] motions to strike for
      cause Juror #24 and Juror #40.

BACKGROUND

Under well-established principles, we state the facts in the light most favorable to the

prevailing party, the Commonwealth.  Gerald v. Commonwealth, 295 Va. 469, 472 (2018).  In

January 2016, thirteen-year-old N.L.[1] lived with her mother in an apartment in Blacksburg. When N.L.'s mother went to wake her daughter on the morning of January 27, 2016, she discovered the child was missing. A nightstand was pushed up against the bedroom door, the window was open, and N.L.'s backpack, jacket, cell phone, and "Minions" blanket were gone. N.L.'s mother immediately reported her daughter missing.

Three days later, on January 30, 2016, a Virginia State Police special agent discovered N.L.'s unclothed, dead body on the side of a road two miles into North Carolina. Following an autopsy, the medical examiner determined that the child died from stab wounds to her neck, one of which severed her jugular vein. She also suffered blunt force injuries while still alive, including a broken neck. The medical examiner did not observe any defensive wounds.

The police investigation focused on David Eisenhauer, a nineteen-year-old student at Virginia Tech. Forensic evidence established that Eisenhauer drove to N.L.'s house on January 27, 2016, at 12:16 a.m. where he remained for five minutes. GPS data showed that Eisenhauer's vehicle then traveled to Craig Creek Road in Blacksburg and stayed for forty-four minutes before returning to campus.

Eisenhauer and appellant, a freshman engineering student at Virginia Tech, had planned N.L.'s murder in detail, including exchanging text messages on their cell phones. Surveillance cameras from a nearby Walmart revealed that appellant and Eisenhauer purchased a shovel the day before N.L.'s disappearance. On the night of January 26, 2016, they appeared on security-camera footage at a local fast-food restaurant. The following day, appellant helped Eisenhauer move the victim's body to North Carolina. Eisenhauer subsequently sent appellant a text message stating, "We definitely did overkill[,] but that's good." Appellant responded, "We are safe and just need to dispose of the one thing and we are done."

---

[1] We refer to the child by her initials to protect her privacy.

On January 30, 2016, after N.L.'s body was discovered, police arrested Eisenhauer for her murder. Eisenhauer identified appellant as an alibi witness, and Detective Ryan Hite of the Blacksburg Police Department and FBI Special Agent Michael Scimeca went to appellant's dormitory room to interview her. Pursuant to university policy, a Virginia Tech police detective accompanied the investigators on campus. Appellant was not present, but her roommate suggested that she might be at her boyfriend's off-campus apartment.

A. Police interviews with appellant

At approximately 9:30 a.m. on January 30, 2016, the three officers located appellant at the apartment. The officers were in plain clothes and armed; however, their weapons were not visible under their overcoats. They told appellant that she was "not in trouble" but asked her to come to the police department to discuss "an ongoing investigation." In response to appellant's questions, the officers advised her that the investigation concerned the missing girl featured on the news. Appellant agreed to accompany the officers, who drove her to the police department in an unmarked SUV; they did not handcuff her or activate their lights or siren during the drive. The police maintained recordings of all their interactions with appellant.

Due to the investigation of N.L.'s disappearance, many law enforcement officers were at the police station. The lobby doors were secured, so the officers brought appellant in through a police-only door that required a key for entry. They spoke with her in a room designated "interview" on the door, which was closed for privacy but not locked. Appellant brought her purse and backpack and was not searched or restrained in any manner. She was permitted to use a bathroom and was offered food and water several times.

After initially denying that she knew anything about N.L.'s disappearance, appellant later stated that Eisenhauer told her he met an underage girl at a party and might have had sex with her.

- 3 -

Appellant denied shopping at Walmart with Eisenhauer prior to N.L.'s disappearance, but when the officers presented her with surveillance video footage from the store, she acknowledged being there.

At approximately 12:15 p.m. that same day, appellant gave the police written consent to search her phone. She also admitted texting Eisenhauer earlier that morning and telling him the police were at her door. Although appellant stated that she knew the child was dead, she repeatedly denied being present when Eisenhauer killed N.L. Appellant told the police that Eisenhauer forced her to help move N.L.'s body to the side of the road near the North Carolina border where N.L. was found. She explained that she discarded some of the evidence related to the murder on January 28, 2016, and retained other items, including N.L.'s "Minions" blanket, in her dorm room.

According to Detective Hite, although he no longer considered appellant merely an alibi witness at that time, he did not yet consider her a suspect. He stated that even though she was not detained, she never asked to leave.

At 6:00 p.m., appellant willingly accompanied the police to Craig Creek Road, the location where police suspected the killing occurred. Upon their return to the police station, appellant helped create a timeline of the week that N.L. was killed. Shortly after midnight, the police arrested her for unlawful concealment of a body and accessory to murder. Following her arrest, the police did not question her further, and she was held overnight in jail.

At approximately 12:30 p.m. on January 31, 2016, the police met with appellant at the jail. Appellant was handcuffed and shackled with a waist chain. Using a pre-printed form, the detectives read her the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966). Detective Hite also told her:

> We just want to pick up where we left off and go over some stuff with you.
>  . . . .
>
> The only issue is clearly we aren't here to arrest you, charge you, or anything like that[;] but, obviously, at least you're in the custody of

the jail just because you're here . . . so, with that, there is a procedure we need to go over. I have to basically read you your rights.

. . . .

It just says that you're cool talking to us still, and that, you know, if you change your mind at any time, then you don't have to, you know, that kind of stuff. But like I said, it's more of a procedural issue because you're in their custody. It really doesn't change anything with us.

. . . .

[A]gain, this is just procedural stuff. What we'll do is just have you read this and then get you to check it over and get you to fill out and sign if you're still okay with that. And, you know, it's a little less glamorous [than] what you hear on TV, but it does kind of sound the same.

For approximately two minutes, appellant reviewed the one-page waiver and, after asking some questions about how to fill it out, signed the document.

The police took appellant to identify several locations related to the crime. While they were out, they learned that an attorney claiming to represent appellant had arrived at the jail. Appellant signed an addendum to her Miranda waiver agreeing to "continue [the] evidence search and meet with [the] attorney later." When the police returned to the jail with appellant that evening, she did not ask for the attorney's information or to meet with him.

Although she continued to deny being present when N.L. was murdered, appellant admitted that she helped Eisenhauer plan the murder. She told the police that Eisenhauer discussed "offing [N.L.], maybe like a week before [they] came back from [winter] break." She admitted that she helped Eisenhauer pick a location to murder N.L. and being involved in the plan made her feel "special" and part of a secret club.

Before trial, appellant moved to suppress all her statements to the police and any physical evidence obtained as a result. The court held a two-day hearing on appellant's motion during which both parties played video and audio clips from appellant's interview, and Detective Hite testified.

He described appellant as "intelligent" and "articulate." The court found that appellant voluntarily accompanied the police to the station where, initially, she was not in custody. The court characterized the detectives' questioning as "conversational" and not "confrontational in any manner," and it concluded that appellant was not coerced into making any statements.

However, the court found that appellant's custodial status changed at the video timestamp of 15:21[2] on January 30, 2016, when she asked the detectives if she was in trouble and they responded that they were not sure what would happen to her but her "honesty and cooperation will go a long way." It was at this time, the court found, that the detectives first "manifest[ed] to [appellant] that she may be charged with a crime." The court determined that a reasonable person would not feel free to leave at that point. Accordingly, it suppressed any statements appellant made after timestamp 15:21 on January 30, 2016.

The court denied the motion to suppress the January 31, 2016 statements, finding that appellant was properly advised of her rights and "knowingly, voluntarily[,] and intelligently" waived them. The court noted that appellant was advised that an attorney had come to the jail to represent her when she was traveling with the officers and she chose not to talk to the lawyer at that time.

Appellant subsequently filed a motion for reconsideration and clarification. The court denied the majority of the motion but ordered suppression of the timeline because it was prepared on January 30, 2016, after appellant was in custody.

### B. Jury selection

The parties spent the first day of trial selecting a jury. Initially, potential jurors were questioned in groups of twelve, with individual *voir dire* also permitted if counsel requested. The

---

[2] At trial, the parties agreed that the timestamp on the video recording displayed one hour ahead of the actual time.

court struck several jurors for cause, at either the Commonwealth's or appellant's request. However, the court denied appellant's motion to strike two additional jurors for cause, Jurors 24 and 40.

Juror 24 was individually questioned about a Facebook page that she and her husband jointly maintained. A local news station posted a story on Facebook reporting that appellant had been denied bond, and a user from Juror 24's Facebook account "liked" the story and commented, "Great. Now give her the needle."

Juror 24 denied posting the comment. She opined that her husband might have written it, and she stated that she did not agree with her husband on that topic or "a lot" of issues. When asked if she would be able to find appellant not guilty if the Commonwealth did not prove the case, Juror 24 replied that she would "listen to all the evidence and hear all the facts before . . . making a judgment against anybody." The court found that Juror 24 was "straightforward and she doesn't necessarily agree with her husband on everything." Further, it concluded Juror 24 was adamant that she would consider all the evidence before making a decision.

During individual *voir dire*, Juror 40 advised that she learned appellant had pled guilty to concealing a body. Juror 40 stated that she read on Facebook that N.L.'s mother felt that because appellant pled guilty to that charge, appellant was involved with the murder. Juror 40 agreed that concealing a dead body and murder were "two separate crimes" and that the Commonwealth was required to prove each individual offense. She stated that she "probably" had an opinion about appellant's guilt. The attorneys then engaged Juror 40 in the following colloquy:

> [Commonwealth Attorney ("CA")]: Okay. Is that opinion so firmly entrenched, what I'm saying is, is that opinion so strong with you that no matter what the evidence is you hear here, that you're just going to stick with that opinion?
>
> Juror No. 40: No.
>
> [CA]: Okay.

Juror No. 40:  I don't believe so.

[CA]:  Do you believe that you can come in with, you can set that opinion aside, open your mind up, listen to the evidence, listen to what the [j]udge tells you the law is, and come to a fair decision, meaning a decision only made on the evidence and the law?  Do you think you could do that, or not?

Juror No. 40:  I think I could.

[CA]:  Okay.  All right.  I think that's the only thing the Commonwealth has to follow up with, [j]udge.

[Defense counsel ("DC")]:  [Juror 40], thank you again.  Your knowledge about the case, you went into it with [the CA].  Why did you hesitate and say you might be impartial, or not be able to be impartial, excuse me?

Juror No. 40:  Well, I guess because I don't know what the evidence is going to be, you know.  I mean I have heard an opinion already, but I don't know what the evidence is going to be presented to cause me to, or I don't even really know what the law is yet that would cause me to reconsider what I heard.

[DC]:  So –

Juror No. 40:  I want to be fair, so I guess that is one of the reasons I hesitate.  I want to be fair but I –

[DC]:  Do you think you can in this case?

Juror No. 40:  I think I can.  You know, I mean his questions I answered honestly.

[DC]:  Oh I know, I'm not challenging.

Juror No. 40:  If they present to me, I mean I think I can listen to the [j]udge's instructions and listen to the evidence.  I've not already made up my mind that, you know, the verdict is guilty, but I also cannot sit here and honestly say that what I heard is not going to bias me.  Does that make any sense?

[DC]:  Yeah.  Thank you for your honesty.

Juror No. 40:  I'm just trying to be honest.

[DC]:  I appreciate that, I really do.  Judge, that's all the questions I have.

[CA]:  I have no follow[-]ups, [j]udge.

The Court:  Thank you, [Juror 40], if you will go back.

The judge did not question Juror 40.  It declined to strike Juror 40 for cause and stated, "I think she was pretty honest.  She said she could be fair and impartial.  I will deny the motion."

## ANALYSIS

### A.  Motion to suppress interview statements

Appellant contends the court erred by admitting her interview statements made on both January 30 ("day one") and January 31, 2016 ("day two").  She argues that the court should have also suppressed the statements she made prior to the 15:21 timestamp on day one, because she was in custody and not advised of her Miranda rights.  She asserts that her day two statements "were the product of a two-step interrogation strategy designed to circumvent Miranda, a tactic specifically proscribed in Missouri v. Seibert, 542 U.S. 600 (2004)."  Finally, she contends that her statements on both days were involuntary because she was coerced by the police.

### 1.  Statements on day one

On appeal, appellant bears the burden to show that the court committed reversible error by denying her motion to suppress.  Secret v. Commonwealth, 296 Va. 204, 224 (2018).  "Whether the circumstances of [a police interview] were such as to require Miranda warnings is a mixed question of law and fact."  Spinner v. Commonwealth, 297 Va. 384, 392 (2019).  Appellate courts "review such questions *de novo* but defer to the fact-finder's findings of historical fact unless they are plainly wrong or without evidence to support them."  Id.

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[3]  The United States Supreme

---

[3] "[T]he Fifth Amendment . . . 'applies to the [s]tates by virtue of the Fourteenth Amendment.'"  Zebbs v. Commonwealth, 66 Va. App. 368, 374 (2016) (quoting Maryland v. Shatzer, 559 U.S. 98, 103 (2010)).

Court addressed this guarantee in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), where it prohibited the prosecution from "us[ing] statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.

The United States Supreme Court's ruling in <u>Miranda</u> requires the police to provide warnings when a suspect is both in custody and being interrogated. <u>Watts v. Commonwealth</u>, 38 Va. App. 206, 214 (2002). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444. "The ultimate inquiry into whether an individual is subject to custodial interrogation is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." <u>Spinner</u>, 297 Va. at 392 (quoting <u>Taylor v. Commonwealth</u>, No. 1031-14-4, at *10 (Va. Ct. App. Sept. 13, 2016)). <u>See also</u> <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).

To evaluate a suspect's custodial status, we must determine "how a reasonable person in the suspect's situation would have understood his circumstances." <u>Alvarez Saucedo v. Commonwealth</u>, 71 Va. App. 31, 41 (2019) (quoting <u>Dixon v. Commonwealth</u>, 270 Va. 34, 40 (2005)). Factors relevant to this determination include whether the police used physical restraints, displayed their weapons, engaged in physical contact, or told the suspect he was free to leave. <u>Id.</u> The number of officers present and whether the police "engaged in other incidents of formal arrest such as booking" are also probative of custodial status. <u>Id.</u> (quoting <u>Hasan v. Commonwealth</u>, 276 Va. 674, 680 (2008)). Further, courts may consider "the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual." <u>Harris v. Commonwealth</u>, 27 Va. App. 554, 565 (1998). "No single factor is dispositive of the issue." <u>Aldridge v. Commonwealth</u>, 44 Va. App. 618, 642 (2004) (quoting <u>Harris</u>, 27 Va. App. at 566).

In Aldridge, the defendant, an eighteen-year-old college student, willingly accompanied two police officers from her dormitory room to the police station. Id. at 628-29. The police interviewed her in a room with a closed but unlocked door. Id. at 629. They did not tell the defendant that she was free to leave but offered her food and drinks and told her not to walk around the facility by herself. Id. When the police advised her that they were investigating the discovery of a baby's body, the defendant became distraught and stated that she gave birth and thought the child was stillborn. Id. at 629-30. The police left the room, returned about forty minutes later, and advised the defendant of her Miranda rights, which she waived. Id. at 630. The defendant then confessed that the baby had been born alive and that she submerged the infant in bathwater. Id. at 630-31.

We affirmed the court's ruling that the defendant was not in custody when she confessed. Id. at 647. "It is the *custodial nature* rather than the *location* of the interrogation that triggers the necessity for giving Miranda warnings." Id. at 643 (emphasis added) (quoting Coleman v. Commonwealth, 226 Va. 31, 47 (1983)). Additionally, the other circumstances of the interview did not support a conclusion that the defendant was in custody. Id. at 643-47.

Here, appellant made statements to police under similar circumstances. Both appellant and the defendant in Aldridge were college students who willingly accompanied law enforcement officers to a police station. See id. at 628-29. Neither was restrained, the questioning occurred in a room with a closed but unlocked door, and the police did not engage in any formal incidents of arrest, such as booking, when arriving at the police station. See id. at 629-30. See also Alvarez Saucedo, 71 Va. App. at 43 (finding interview at police station non-custodial where the defendant was interviewed by a detective and a Spanish interpreter in a closed but unlocked polygraph suite, and the defendant was not restrained or required to comply with formal incidents of booking).

These factors support the court's findings that appellant's interview was non-custodial until 15:21 and that police treated her as a potential witness, not a suspect, prior to that time. The police

- 11 -

did not exert any force or restrain appellant in any manner, both when transporting her to the police station and during the questioning there. The questioning, which was initially "conversational" and non-confrontational, occurred in a room with the door closed but not locked. Prior to 15:21, the investigators consistently advised appellant that she was "not in trouble." Although appellant was not specifically told that she could leave at any time, she never asked to go. She was provided with food and water and allowed to keep her purse, backpack, and cell phone, which were not searched. Therefore, we find that the court did not err in determining that a reasonable person would have felt free to leave under the circumstances of appellant's interview. See id. at 41.

2. Statements on day two

Appellant also asserts that the court erred in denying her motion to suppress her statements from day two. Initially, appellant contends that her Miranda waiver was not knowing or intelligent because the officers' gratuitous comments diminished the importance of her Miranda rights. Appellant also argues that the United States Supreme Court's holding in Missouri v. Seibert, 542 U.S. 600 (2004), required the court to suppress her confession. However, these arguments are unpersuasive.

First, we disagree with appellant's assertion that her Miranda rights were "diluted" due to the officers' remarks that their duty to advise her of her rights is a "procedural issue" that "really doesn't change anything." She claims that these statements, along with psychological pressure, vitiated her waiver and rendered her statements inadmissible.

"A person may waive his rights under Miranda 'if the waiver is made knowingly and intelligently.'" Tirado v. Commonwealth, 296 Va. 15, 27 (2018) (quoting Angel v. Commonwealth, 281 Va. 248, 257 (2011)). Courts may consider "the defendant's age, education, language, alienage, experience with police, and whether the defendant stated that he understood his rights as read to him" to evaluate "whether the defendant comprehended the plain meaning of the

- 12 -

required warnings." Id. at 29. This decision is a question of fact, and "the circuit court's determination on this issue 'will not be set aside on appeal unless plainly wrong.'" Id. at 27-28 (quoting Angel, 281 Va. at 258).

In its ruling, the court noted that the police not only advised appellant of her Miranda rights, they also told her she was free to refuse to answer any questions and could stop talking any time she chose. Detective Hite described appellant, a freshman engineering student, as "intelligent" and "articulate." Appellant signed a pre-printed form listing her Miranda warnings, and she did not express any confusion or hesitation in her discussions with police. The court also observed that appellant declined to terminate her conversation with the police when she was told that an attorney was waiting at the jail to talk to her. "[W]hether [the defendant] fully . . . understands the tactical advantage, in our system of justice, of not speaking [] does not affect the validity of his waiver." Id. at 29 (quoting United States v. Yunis, 859 F.2d 953, 965 (D.C. Cir. 1988)). The record supports the court's finding that appellant knowingly and intelligently waived her rights.

We also disagree with appellant's argument that her statements should have been suppressed based on the United States Supreme Court's holding in Missouri v. Seibert, 542 U.S. 600 (2004). Seibert provides a narrow exception to the general rule established in Oregon v. Elstad, 470 U.S. 298 (1985). In Elstad, the United States Supreme Court considered "whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper Miranda warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." 470 U.S. at 303.

While Elstad was detained at his residence, he made an inculpatory statement to the police before being advised of his Miranda rights. Id. at 300-01. Upon his arrest, the defendant was informed of his rights, waived them, and confessed. Id. at 301. The United States Supreme Court held that "absent deliberately coercive or improper tactics," "an earlier voluntary but unwarned

admission from the defendant" would not require suppression of a subsequent confession made after proper Miranda warnings. Id. at 303, 314. See also Secret, 296 Va. at 220, 225-27 (applying Elstad and affirming admission of subsequent statement made after Miranda warning because "[t]he relevant inquiry is whether, in fact, the second statement was also voluntar[y]" (quoting Elstad, 470 U.S. at 318)).

In Seibert, upon which appellant relies, the police arrested the defendant for murder. 542 U.S. at 604-05. She was taken to the police station where, pursuant to department policy, the arresting officer deliberately did not advise her of her Miranda rights, but questioned her for approximately thirty to forty minutes. Id. After the defendant confessed, the officer gave her a coffee and cigarette break and left the room. Id. at 605. Upon his return, he advised the defendant of her Miranda rights and resumed questioning until she reiterated her earlier confession. Id.

The United States Supreme Court concluded that the officer's "'conscious decision' to withhold Miranda warnings" was distinguishable from the facts in Elstad. Id. at 605-06, 614-17. It found that the interrogation technique "undermine[d] [Seibert's] Miranda warnings" and rendered her post-warning statements inadmissible. Id. at 616. The United States Supreme Court held that "[t]he admissibility of postwarning statements should continue to be governed by the principles of Elstad," except "in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Id. at 622 (Kennedy, J., concurring).[4]

Therefore, to determine the admissibility of post-warning statements, a court must consider whether "an interrogator use[d] this deliberate, two-step strategy, predicated upon violating Miranda

---

[4] In Secret, the Virginia Supreme Court addressed the fragmented opinions in Seibert to interpret the controlling rule of the case. 296 Va. at 222. It determined that "[b]ecause Seibert is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law." Id. (quoting United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006)).

during an extended interview." Id. at 621 (Kennedy, J., concurring). Because this "deliberateness finding is appropriately reviewed as a factual finding," we consider whether the court was plainly wrong or without evidence in reaching its decision. Secret, 296 Va. at 223-24 (quoting Kuhne v. Commonwealth, 61 Va. App. 79, 92 (2012)).

Here, the court's factual findings support its conclusion that the detectives did not deliberately violate Miranda by advising appellant of the warnings after obtaining a confession from her. Until shortly before her arrest, the detectives did not believe that appellant was a suspect. Rather, they were interviewing her to gain more information about Eisenhauer, who had been arrested and provided appellant's name as an alibi witness. Based on their testimony, the officers had no reason to believe that appellant was involved in the murder until she admitted her involvement as the interview progressed throughout day one. The court also found that the officers did not employ any coercive interview tactics, and unlike the defendant in Seibert, appellant was not placed under arrest before she was initially questioned. Therefore, the court did not err in finding that the detectives did not engage in the "deliberate, two-step strategy" as proscribed by Seibert. 542 U.S. at 621.

### 3. Voluntariness of appellant's statements

Determining the voluntariness of appellant's statements on days one and two is a separate inquiry from the issue of custody. See Bottenfield v. Commonwealth, 25 Va. App. 316, 323-30 (1997) (first determining the voluntariness of the defendant's statements, then considering whether his detention amounted to a custodial interrogation). Although we defer to the court's findings of historical fact unless plainly wrong or without evidentiary support, we review the legal question of voluntariness de novo. Washington v. Commonwealth, 43 Va. App. 291, 300 (2004). "Whether . . . a statement was voluntary or the result of coercive police activity is a legal question to

- 15 -

be determined from a review of the totality of the circumstances." Gwaltney v. Commonwealth, 19 Va. App. 468, 472 (1995). See also Miller v. Fenton, 474 U.S. 104, 110-12 (1985).

To evaluate the voluntariness of a confession on appeal,

> [w]e must [independently] determine whether, in light of the totality of the circumstances, including not only the details of the interrogation, but also the characteristics of the accused, the statement was the product of an essentially free and unconstrained choice by its maker, or whether the maker's will was overcome and his capacity for self-determination critically impaired.

Novak v. Commonwealth, 20 Va. App. 373, 386-87 (1995) (quoting Goodwin v. Commonwealth, 3 Va. App. 249, 253 (1986)). Factors relevant to this determination include "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." Washington, 43 Va. App. at 302-03 (quoting Bottenfield, 25 Va. App. at 323). When evaluating the conduct of the police, we "must consider the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation." Terrell v. Commonwealth, 12 Va. App. 285, 291 (1991).

The court specifically found that appellant made her statements on day one "freely and voluntarily and that there were no coercive actions taken on behalf of the police to obtain [the] information." It further concluded that "[s]he was not coerced [and] her will was not overborne when she voluntarily made the statements to law enforcement on [day two]." Detective Hite testified that he found appellant, a college student majoring in engineering, to be "articulate" and "intelligent." She was not restrained during questioning, and although the interview was lengthy, the detectives provided appellant with food and water throughout.

Appellant argues that the officers applied "tremendous" psychological pressure on her. However, she admits that they told her they did not want to get her in trouble. Further, the court was free to infer that appellant's candor with the detectives reflected the relaxed environment that

the detectives created during the interview. Although appellant argues that her will was overborne, she remained steadfast in her position that she was not present when Eisenhauer murdered N.L., a fact the court noted in finding that the police did not coerce appellant.

Several times during the interview, the detectives indicated that appellant's honesty would benefit her. They told appellant that her cooperation would "go a long way" with their superiors and the prosecutor. However, these implications did not amount to actual promises of leniency. See, e.g., Washington, 43 Va. App. at 303-04 (finding no coercion where police told a defendant that prosecutors would be made aware of any help he gave and would look more favorably upon him as a result). Therefore, based on the totality of circumstances, we find the court did not err in finding appellant's statements to the police were voluntary.

### B. Jury selection

Appellant contends the court should have struck Jurors 24 and 40 for cause because of both jurors' hesitation that they could be "free from partiality and prejudice," relying on Wright v. Commonwealth, 73 Va. 941, 943 (1879).

The right to an impartial jury is protected by the United States and Virginia Constitutions and by statute. U.S. Const. amend VI; Va. Const. art. I, § 8; Code §§ 8.01-357, -58. "Our precedent is of long standing that a venireman will not be excluded from the jury if that person 'stands indifferent in the cause.'" Townsend v. Commonwealth, 270 Va. 325, 330 (2005) (quoting Code § 8.01-358). "If [a juror] has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law." Lovos-Rivas v. Commonwealth, 58 Va. App. 55, 60-61 (2011) (quoting Spangler v. Ashwell, 116 Va. 992, 996-97 (1914)).

On review of a court's decision to deny motions to strike for cause, appellate courts

> must give deference to the circuit court's determination whether to exclude a prospective juror because that court was able to see and hear each member of the venire respond to questions posed. The circuit court is in a superior position to determine whether a prospective juror's responses during *voir dire* indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath.

Green v. Commonwealth, 262 Va. 105, 115 (2001). See also Huguely v. Commonwealth, 63 Va. App. 92, 121 (2014) ("Juror impartiality is a question of fact and a trial court's decision to seat a juror is entitled to great deference on appeal." (citation omitted) (quoting Lovos-Rivas, 58 Va. App. at 61)).

"[A] trial court's denial of a motion to strike a juror for cause 'will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion.'" Townsend, 270 Va. at 329-30 (quoting Barrett v. Commonwealth, 262 Va. 823, 826 (2001)). "A manifest error occurs when the record shows that a prospective juror cannot or will not lay aside his or her preconceived opinion." Taylor v. Commonwealth, 67 Va. App. 448, 456 (2017).

### 1. Juror 24

Appellant contends that based on "the Facebook evidence," Juror 24 was not impartial. However, Juror 24 explained that she and her husband share the Facebook account, she did not "like" the news story about appellant being denied bond, and she was not the one who posted the comment about appellant receiving capital punishment. Further, Juror 24 explained that she and her husband have different views "on many issues." She unequivocally stated that she could be fair and impartial.

The court had the opportunity to observe Juror 24 and determine her "sincerity, conscientiousness, intelligence, and demeanor . . . first hand." Juniper v. Commonwealth, 271 Va. 362, 400-01 (2006) (quoting Pope v. Commonwealth, 234 Va. 114, 124 (1987)). After hearing her

answers during *voir dire*, the court made a factual determination that Juror 24 was being honest that she did not engage in the activity on Facebook and did not hold any preconceived beliefs about appellant's guilt. We defer to the court's assessment of the juror's "competency to serve impartially" because this finding was not plainly wrong or without evidence to support it. Garcia v. Commonwealth, 60 Va. App. 262, 270 (2012) (quoting Patton v. Yount, 467 U.S. 1025, 1039 (1984)). Accordingly, we find no manifest error amounting to an abuse of discretion regarding Juror 24's competency to serve. See Townsend, 270 Va. at 329-30.

### 2. Juror 40

Appellant contends that Juror 40's answers to the *voir dire* questions were "equivocal" and that she merely assented to leading questions from the Commonwealth. She asserts that contrary to the court's finding that Juror 40 could be impartial and fair, Juror 40's responses indicated that her preexisting bias toward finding appellant guilty would continue through the trial.

In deferring to a court's decisions regarding jury selection, we "recogni[ze] that 'a trial judge who personally observes a juror, including the juror's tenor, tone, and general demeanor, is in a better position than an appellate court to determine whether a particular juror should be stricken.'" Hopson v. Commonwealth, 52 Va. App. 144, 151 (2008) (quoting Teleguz v. Commonwealth, 273 Va. 458, 475 (2007)). "[T]he trial court must weigh the meaning of the answers given in light of the phrasing of the questions posed, the inflections, tone, and tenor of the dialogue, and the general demeanor of the prospective juror." Castillo v. Commonwealth, 70 Va. App. 394, 423 (2019) (quoting Smith v. Commonwealth, 219 Va. 455, 464-65 (1978)).

Here, during extensive individual *voir dire*, appellant's counsel questioned Juror 40 about why she "hesitate[d]" in answering a question, and she replied, "I want to be fair, so I guess that is one of the reasons I hesitate . . . I think I can. You know, I mean his questions I answered honestly." The court had the opportunity to evaluate Juror 40's tone and manner of speaking and

concluded that she was "pretty honest. She said she could be fair and impartial." The record supports the court's conclusion.

Further, when reviewing a court's determination whether to excuse a juror for cause, we consider the juror's *voir dire* in its entirety. Vinson v. Commonwealth, 258 Va. 459, 467 (1999). Appellant focuses on two isolated statements made by Juror 40, not the entirety of her *voir dire*. She asserts that Juror 40's response to the question of whether she could be fair and impartial - "I think I can" - was equivocal and merely an assent to a leading question from counsel. Appellant also argues that Juror 40's statement, "I . . . cannot sit here and honestly say that what I heard is not going to bias me," established that she was not qualified to sit on the jury.

Both statements are taken out of context, and we defer to the trial court to resolve any potentially equivocal statements because of its opportunity to observe the juror's tone and demeanor. See Weeks v. Commonwealth, 248 Va. 460, 475 (1994). In Weeks, the Supreme Court affirmed a court's decision to retain a juror who answered the question of whether he could be impartial with "I think so." Id. The Court ruled,

> Our duty to defer to the trial judge on this subject is illustrated by [the juror's] final answer, "I think so," which the trial judge, not this Court, heard. The juror's emphasis on "so" in that answer conveys an entirely different meaning than if the emphasis had been on "think." On appeal, we must presume he emphasized "so."

Id. Similarly, here, we must conclude that the court heard Juror 40 emphasize the word "can" in her reply, "I think I can."

The trial court's role during the juror's *voir dire* also impacts the extent to which we defer to its judgment. When a juror initially indicates prejudice or a predisposition, the court may not direct the juror's rehabilitation. Gosling v. Commonwealth, 7 Va. App. 642, 646-47 (1989). "Mere assent to a trial judge's questions or statements . . . is not enough to rehabilitate a prospective juror who has initially demonstrated a prejudice or partial predisposition." Griffin v. Commonwealth, 19

- 20 -

Va. App. 619, 625 (1995). "Evidence of the requisite qualifications for impartial service must emanate from the juror, unsuggested by leading questions." Gosling, 7 Va. App. at 646-47. Here, the court did not impermissibly attempt to rehabilitate Juror 40 during *voir dire*. The fact that the judge remained "detached" is significant. McGill v. Commonwealth, 10 Va. App. 237, 242-43 (1990). We have stated,

> The proper role for a trial judge is to remain detached from the issue of the juror's impartiality. The trial judge should rule on the propriety of counsel's questions and ask questions or instruct only where necessary to clarify and not for the purposes of rehabilitation. If a trial judge adheres to this role, an appellate court may not set aside the trial judge's determination of a juror's impartiality if the juror's responses, even though conflicting, support that determination.

Id.

During Juror 40's *voir dire*, she answered questions from both the prosecutor and defense counsel and volunteered explanations for her answers. The court did not question her or comment on the questions asked by counsel. It was only at the conclusion of *voir dire* that the court found that Juror 40 could be fair and impartial. Because *voir dire* was properly conducted, the responses from Juror 40 supported the court's finding that she was impartial.

Finally, Juror 40 made a number of other statements, some in response to questions and some volunteered, which in their entirety support the court's conclusion that she could be fair and impartial. She expressed an understanding that murder was a separate and distinct crime from concealing a dead body. She stated that she was not "just going to stick with [her] opinion" but would wait to hear the evidence and learn "what . . . the law is." Jurors "cannot be expected invariably to express themselves carefully or even consistently." Garcia, 60 Va. App. at 270 (quoting Patton, 467 U.S. at 1039). In a juror's responses to *voir dire*, "[t]he spectrum of opinion can range, by infinite shades and degrees, from a casual impression to a fixed and abiding conviction." Briley v. Commonwealth, 222 Va. 180, 185 (1981). Considering Juror 40's answers

in their entirety, we find that the court did not commit manifest error by denying appellant's motion to strike her for cause.  See Townsend, 270 Va. at 329-30.

## CONCLUSION

For the reasons stated above, we find that the court did not err in denying appellant's motion to suppress and did not abuse its discretion in refusing to strike two jurors for cause.  Accordingly, we affirm appellant's conviction for acting as an accessory before the fact to murder.

Affirmed.